# In the United States Court of Federal Claims

No. 21-1746
(Filed: April 30, 2024)

```
* * * * * * * * * * * * * * * * *    *
                                     *
NAVAJO NATION, et al.,               *
                                     *
                   Plaintiffs,       *
                                     *
        v.                           *
                                     *
THE UNITED STATES,                   *
                                     *
                   Defendant.        *
                                     *
    * * * * * * * * * * * * * * * *   *
```

 *Daniel I.S.J. Rey-Bear*, with whom was *Timothy H. McLaughlin*, Rey-Bear McLaughlin LLP, of Spokane, WA, for Plaintiff.

 *Sara E. Costello*, Trial Attorney, Environment & Natural Resources Division, Natural Resources Section, Department of Justice, of Washington, D.C., for Defendant.

## <u>OPINION AND ORDER</u>

**SOMERS**, Judge.

 Plaintiffs, the Navajo Nation and multiple Navajo families ("beneficiaries"), filed a complaint against the United States for damages sustained from alleged federal maladministration of grazing, leasing, rights-of-way, revenue deposits, investments, and expenditures regarding tribal land that the United States holds in trust for the Navajo Nation. In response, the government moved to dismiss the beneficiaries' claims, the claims brought by the Nation that accrued prior to a 2014 settlement between the government and the Nation, the leasing and rights-of-way claims, the claims for trespass damages, and the request for equitable relief. For the reasons explained below, the Court grants the government's motion to dismiss the beneficiaries' claims, any of the Nation's claims that accrued prior to the 2014 settlement, and any claims for trespass damages. The Court denies the government's motion to dismiss the Nation's leasing and rights-of-way claims and reserves ruling on the government's motion to dismiss the Nation's request for equitable relief.

# BACKGROUND

## A.      The Navajo-Hopi Land Settlement Act of 1974

In 1882, President Chester A. Arthur signed an Executive Order that set aside approximately 2.5 million acres of land in northeastern Arizona for the Hopi Tribe and "such other Indians as the Secretary of the Interior may see fit to settle thereon."  *See* Executive Order of December 16, 1882; *The Navajo Hopi Land Settlement Act Of 1974 Amendments: Hearing on S. 1003 Before the H. Comm. on Resources ("Settlement Act Amendments Hearing")*, 109th Cong. 78 (2005) (statement of William P. Ragsdale, Director, Bureau of Indian Affairs, Department of the Interior).  At the time, a small number of members from the nearby Navajo Tribe resided on portions of the reserved land.  *See Settlement Act Amendments Hearing*, 109th Cong. 78 (2005) (statement of William P. Ragsdale, Director, Bureau of Indian Affairs, Department of the Interior).  In subsequent years, more members of the Navajo Tribe migrated to the reserved land, and it became largely populated by Navajos.  *See Begay v. United States*, 16 Cl. Ct. 107, 110 (1987), *aff'd*, 865 F.2d 230 (Fed. Cir. 1988).

For decades, the Hopi and Navajo tribes coexisted on the 1882 Reservation.  *Sekaquaptewa v. MacDonald*, 626 F.2d 113, 115 (9th Cir. 1980).  During that time, the two tribes, which had historically competed for resources, disputed each other's right to the Reservation.  *See Begay*, 16 Cl. Ct. at 110; *Settlement Act Amendments Hearing*, 109th Cong. 78 (2005) (statement of William P. Ragsdale, Director, Bureau of Indian Affairs, Department of the Interior).  "[N]either tribe had a clear right to the land. The Hopi claimed that they had exclusive beneficial use to all of the 1882 Reservation.  The Navajo claimed an exclusive interest to almost four-fifths of the reservation."  *Sekaquaptewa*, 626 F.2d at 115.

Various legislative and administrative efforts were made to resolve this land conflict between the tribes.  *See Begay*, 16 Cl. Ct. at 110 (citing *Healing v. Jones*, 210 F.Supp. 125 (D. Ariz. 1962), *aff'd*, 373 U.S. 758 (1963) (*per curiam*)).  In 1962, the U.S. District Court for the District of Arizona determined that most of the 1882 reservation lands were held in trust by the United States jointly and equally for both the Hopi and Navajo tribes.  *See id.*  However, this "Joint Use Area" ("JUA") proved to be unworkable, and the tribes' dispute continued.  *See id*; ECF No. 7 at 3 ("Motion").

In 1974, Congress enacted the Navajo-Hopi Settlement Act (the "Settlement Act"), authorizing the judicial partition of the JUA.  *See* 25 U.S.C. § 640d[1]; Motion at 3–4; *Settlement Act Amendments Hearing*, 109th Cong. 78 (2005) (statement of William P. Ragsdale, Director, Bureau of Indian Affairs, Department of the Interior).  The Settlement Act

---

[1] The Settlement Act and its amendments were previously codified at 25 U.S.C. §§ 640d–640d-31.  In 2016, the Office of the Law Revision Counsel omitted the Act and its amendments from Title 25 because they were "of special and not general application." *See* Motion at 4 n.1; ECF No. 1 ("Compl.") at 1 n.1 (citing Office of Law Revision Counsel, U.S. House of Reps., Ed. Reclassif.: Title 25, U.S.C., available at https://uscode.house.gov/editorialreclassification/t25/index.html (last visited Oct. 26, 2022)). The full text of the Act can still be found in 25 U.S.C. § 640d as codified in 2012.  *See* Motion at 4 n.1. As such, all references to the Settlement Act are to the version codified in 2012.

provided for the appointment of a mediator to assist in negotiating a settlement and partition of the Joint Use Area. If no voluntary agreement was reached within 180 days, the [U.S. District Court for the District of Arizona] was given the authority to make a final partition of the Joint Use Area. A federal mediator was appointed, but no voluntary settlement could be worked out. In 1975, the mediator submitted a report to the district court with a recommendation for the judicial partition of the Joint Use Area.

*Sekaquaptewa*, 626 F.2d at 115. In 1977, the U.S. District Court for the District of Arizona ordered the partition of the lands and distributed approximately 900,000 acres to each tribe. *See Begay*, 16 Cl. Ct. at 111, *aff'd*, 865 F.2d 230 (Fed. Cir. 1988). The Ninth Circuit affirmed the partition in 1980. *See id.*

The Settlement Act "required Tribal members residing on the JUA to relocate from the lands partitioned to the other Tribe," Motion at 4, and directed the Secretary of the Interior to transfer in trust for the Navajo Nation, as part of the Navajo Reservation, up to 250,000 acres of land in Arizona and New Mexico from the Bureau of Land Management and up to 150,000 acres of private land close to the Navajo Reservation. *See* ECF No. 1 ("Compl.") ¶ 25; 25 U.S.C. § 640d-10. Title to this land was to be taken "in the name of the United States in trust for the benefit of the Navajo Tribe as a part of the Navajo Reservation." 25 U.S.C. § 640d-10(a)(2). Since 1987, the United States has transferred approximately 375,900 acres of land into trust for the Navajo Nation. Compl. ¶ 26. These lands are commonly referred to as the "New Lands." *See id.*; 25 C.F.R. § 700.701(b). The majority of this land is located in northeastern Arizona. *See* Compl. ¶ 27.

The Settlement Act also created an independent federal agency within the Executive Branch to administer the New Lands until relocation is complete. 25 U.S.C. §§ 640d-10(h); 640d-11. The original agency name was the Navajo and Hopi Indian Relocation Commission, but it is now known as the Office of Navajo and Hopi Indian Relocation ("ONHIR"). *See id.* ONHIR is responsible for administering, *inter alia*, leases, and rights-of-way on the New Lands. *See* 25 U.S.C. 640d-11(c)(2)(A). ONHIR operates under the direction of the Commissioner on Navajo and Hopi Relocation. *See* 25 U.S.C. 640d-11(a). Under the Act, the New Lands "shall be administered by the Commissioner until relocation under the Commission's plan is complete and such lands shall be used solely for the benefit of Navajo families residing on Hopi-partitioned lands ["HPL"] as of December 22, 1974." 25 U.S.C. § 640d-10(h). In addition, "the sole authority for final planning decisions regarding the development of [the New Lands] . . . shall rest with the Commissioner until such time as the Commissioner has discharged his statutory responsibility under this subchapter." *Id.* To fulfill this duty, the Commissioner "may issue leases and rights-of-way for housing and related facilities to be constructed on the [New Lands]." 25 U.S.C. § 640d-11(c)(2)(A); Department of Defense Appropriations Act, Pub. L. 99-190, 99 Stat. 1185, 1236 (1985).

Finally, with regard to its grazing responsibilities, ONHIR promulgated regulations governing grazing on the New Lands. *See* 25 C.F.R. §§ 700.701–700.731. Under those regulations, "[a]ll livestock grazed on the New Lands must be covered by a grazing permit authorized and issued by the Commissioner on Navajo and Hopi Indian Relocation." *Id.* §

700.711(a).  To be eligible for a grazing permit an individual must be an "enrolled Navajo Tribal member[]," over 18 years old, "[m]aintain a permanent residency on the New Lands Range Unit of permit issue," and own grazing livestock on the permitted land.  *Id.* § 700.711(b).  Additionally, they must have relocated "from the HPL on to a New Lands range unit." *Id.* § 700.709(a)(2).  Grazing permits are "issued for a base of 80 SUYL (20 AU) ["Sheep Units Grazed Yearlong" or "Animal Units"] and may not be divided or transferred for less than 80 SUYL." *Id.* § 700.711(c).  Under ONHIR's grazing regulations, "[s]ubpermitting is unacceptable as it provides a method for official division of permits and invites the unacceptable practice of absentee grazing."  56 Fed. Reg. 13,396, 13,397 (April 2, 1991).

Additionally, "[t]he grazing of livestock upon, or driving of livestock across, any of the New Lands without a current approved grazing or crossing permit" is "prohibited."  25 C.F.R. § 700.725(a).  For example,

> [t]he owner of any livestock grazing in trespass on the New Lands is liable to a civil penalty of $1 per head per day for each cow, bull, horse, mule or donkey and 25¢ per head per day for each sheep or goat in trespass and a reasonable value for damages to property injured or destroyed.  The Commissioner may take appropriate action to collect all such penalties and damages and seek injunctive relief when appropriate.  All payments for such penalties and damages shall be paid to the Commissioner for use as a range improvement fund.

*Id.* § 700.725(e).

## B.      Previous Trust Mismanagement Litigation and 2014 Settlement Agreement

In 2002, over one hundred Native American tribes, including the Navajo Nation, filed cases against the United States in the Court of Federal Claims and various federal district courts alleging that the government had breached its trust duties and responsibilities to the tribes.  Motion at 6.  The tribes argued that the government had failed to provide them with "an accounting of federally-managed monetary and non-monetary Tribal trust resources and, in some cases, [sought] monetary compensation for the alleged mismanagement."  *See id.*  These cases became known as the "Tribal trust cases."  *Id.*

The Navajo Nation, like many other tribes, settled their Tribal trust case in July 2014.  Motion at 6 (citing Dep't of Justice Press Release 14-1046 (Sept. 26, 2014)).  The settlement agreement became effective on August 26, 2014.  ECF No. 7-3 ("*Navajo Settlement Agreement*") ¶ 16.  In consideration for $554 million, the Nation waived and released all claims relating to the government's management of the Nation's monetary and non-monetary trust assets and resources that occurred prior to the effective date of the settlement.  *See id.* ¶¶ 2, 4.  The parties subsequently stipulated to the dismissal of the Nation's case with prejudice.  Joint Stipulation of Dismissal (ECF No. 174), *Navajo Nation v. United States*, Case No. 06-945 (Fed. Cl. Nov. 10, 2014).

C.     **Padres Mesa Demonstration Ranch**

In 2009, ONHIR established the Padres Mesa Ranch ("Ranch") on the New Lands, which encompasses approximately 60,000 acres of the New Lands.  Compl. ¶ 29.  "The purpose of the ranch is to teach Navajo relocatees economically successful and environmentally responsible grazing practices, and ONHIR sells the cattle raised on the ranch."  GAO, *In re ONHIR— Compliance with the Purpose Statute and the Miscellaneous Receipts Statute*, Decision B-329446, at 4 (Sept. 17, 2020) ("GAO Ranch Decision").  According to a 2018 Government Accountability Office opinion, ONHIR has statutory authority to operate the Ranch but lacks the authority to retain or obligate revenue from the sale of cattle on the Ranch.  *See* Motion at 6; GAO Ranch Decision at 2.  However, ONHIR maintains that this finding is legally incorrect. *See* GAO, *In re Off. of Navajo & Hopi Indian Relocation-Request for Reconsideration-Compliance with the Miscellaneous Receipts Statute*, Decision B-332596 at 2–3 (July 29, 2021) (summarizing ONHIR's position).  Many of Plaintiffs' claims in the current dispute concern the Padres Mesa Ranch and its surrounding land.

D.     **Current Dispute**

As alleged in the complaint, the Navajo Nation is the "sole beneficial owner" of the New Lands that were transferred to "the United States in trust for the benefit of the Navajo Tribe of Indians as a part of the Navajo Reservation."  Compl. ¶ 5; 25 U.S.C. § 640d-10(a).  Plaintiff, Identifiable Group of Relocation Beneficiaries, consists of approximately 4,000 Navajo families that resided on HPL when the Settlement Act was enacted on December 22, 1974 ("beneficiaries").  *See* Compl. ¶¶ 1, 6–7; 25 U.S.C. § 640d-10(h).  These beneficiaries are represented by ten individual Navajo citizens, each of whom is a member of a Navajo family that resided on HPL as of December 22, 1974.  *See* Compl. ¶¶ 6-7, 19; 25 U.S.C. § 640d-10(h). Under the Settlement Act, these families are entitled to relocation payments and assistance and the New Lands are to be used "solely for the[ir] benefit."  *See* Compl. ¶ 6-7, 19; 25 U.S.C. § 640d-10(h); 25 C.F.R. § 700.131-147.

In August 2021, Plaintiffs filed a complaint in this Court for "damages and a remand regarding federal maladministration of grazing, leasing, rights of way, and revenue deposits, investments, and expenditures" concerning the New Lands.  Compl. ¶ 1.  Plaintiffs' complaint consists of six claims.  First, Plaintiffs claim that ONHIR had a fiduciary responsibility to manage grazing on the New Lands under the Settlement Act and the ONHIR grazing regulations. *See id.* ¶¶ 38–58.  Plaintiffs argue that ONHIR "failed to comply" with these fiduciary duties to administer New Lands grazing by, *inter alia*, grazing livestock on the Padres Mesa Ranch without a grazing permit, allowing "non-Navajos" and "non-Indians who are not eligible for grazing permits" to graze on the New Lands via livestock leasing, not allowing grazing "when [doing] so would benefit the Relocation Beneficiaries," and failing to collect required trespass penalties and damages.  *See id.*

Second, Plaintiffs claim that under the Settlement Act and the ONHIR Management Manual ("OMM"), ONHIR has affirmative fiduciary duties regarding leases on the New Lands. Plaintiffs assert that ONHIR breached these fiduciary duties by entering into leases for property on the New Lands but failing to manage them properly.  *See id.* ¶ 69.  Plaintiffs provide several

examples of ONHIR's alleged leasing maladministration.  Plaintiffs assert that: (1) ONHIR "does not have a full inventory of leased and vacant New Lands or of the leases or surface use agreements that ONHIR has entered into regarding the New Lands," *id*. ¶ 70; (2) ONHIR "has occupied or allowed others to occupy at least seven New Lands properties without a written lease, as required by the [OHNIR Management Manual ("OMM")]," *id*. ¶ 73; (3) ONHIR "has improvidently allowed New Lands to remain vacant and unused for extended periods," *id.* ¶ 80; (4) ONHIR has, contrary to the OMM, acted as the lessor for various leases without due affirmative authorization by the Nation under Navajo law. . . even though ONHIR does not have authority to lease the New Lands on its own," *id.* ¶ 81; (5) ONHIR has leased multiple parcels of the New Lands with approval only from the Nahta Dziil Chapter (NDC),[2] instead of from the Nation itself, which Plaintiffs assert is required by the OMM and Navajo law, *id.* ¶¶ 82–83; (6) ONHIR has leased New Lands at below-market rent without authorization from the Nation, *id.* ¶ 91; and (7) ONHIR authorized the Ranger Helium Agreement ("RHA")[3] substantially below market value with annual payments of $1,000 per well, *id.* ¶ 95.

Third, Plaintiffs claim that under the Relocation Act, the OMM, and Title 25 of the Code of Federal Regulations, ONHIR has an enforceable fiduciary duty to administer rights-of-way "on and across the New Lands notwithstanding the requirement for consent by the Nation." *See id.* ¶¶ 99–105.  Plaintiffs allege that the government "breached its fiduciary duties to exercise due care and prudence for trust property by realizing values for rights-of-way far below their fair market values without the consent of the Nation or waiver of fair market consideration." *Id.* ¶ 105.

Fourth, Plaintiffs claim that under the Relocation Act, the Permanent Appropriation Repeal Act ("PAR Act"), and the OMM, "the United States has a legal, fiduciary duty to promptly deposit all revenue from the Arizona New Lands in a federally held trust account for the Navajo Nation and the Relocation Beneficiaries, and to deposit New Mexico New Lands net income in the NRTF." *Id.* ¶ 118.  Plaintiffs allege that the government breached this fiduciary duty by failing to (1) properly administer and account for new lands revenue, and (2) promptly collect New Lands revenue, as well as various grazing trespass penalties and damages, and deposit them in trust for the beneficiaries. *See id.* ¶¶ 127–134.

Fifth, Plaintiffs claim that since fiscal year 2009, "[t]he United States has improperly expended and spent without legal authorization over $3.5 million in revenues from the New Lands" in violation of the Settlement Act and Title 25 of the U.S. Code. *See id.* ¶¶ 135–142.  In their sixth and final claim, Plaintiffs assert that under Title 25, "the United States owes fiduciary duties to the Nation and the Relocation Beneficiaries to promptly and prudently invest or earn interest from New Lands revenues in order to maximize the rate of return on those revenues." *Id.* ¶ 149.  Plaintiffs allege that the government breached these duties by failing to "promptly invest or earn interest on and to maximize returns from New Lands revenues." *Id.* ¶ 150.

---

[2] The NDC is the 110th chapter of the Navajo Nation that is located on the New Lands.
[3] In 2015, ONHIR entered into a surface use agreement with Ranger Development LLC for the use of approximately 320 acres of New Lands for helium production. Compl. ¶ 83.  Plaintiffs allege that ONHIR did so with authorization from the NDC, but not from the Nation itself, which Plaintiffs argue is required by the OMM and Navajo law.  *Id.*

In response to Plaintiffs' complaint, the government moved for partial dismissal pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  In its motion, the government requests that the Court dismiss: (1) the beneficiaries' claims for lack of standing and subject matter jurisdiction; (2) any claims that accrued prior to the 2014 trust settlement, under the doctrines of claim preclusion, waiver, and release; (3) the leasing and rights of way claims for lack of subject matter jurisdiction; (4) any claims for trespass damages and penalties against the United States; and (5) Plaintiffs' request for equitable relief for lack of subject matter jurisdiction.

## DISCUSSION

### A.   Legal Standard

#### 1.  The Indian Tucker Act

The United States Court of Federal Claims, like all federal courts, is a court of limited jurisdiction.  Under the Tucker Act, this Court may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1). However, "[t]he Tucker Act does not, of itself, create a substantive right enforceable against the United States." *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013) (citing *Ferreiro v. United States,* 501 F.3d 1349, 1351 (Fed. Cir. 2007)).  Rather, to state a claim within the Court's jurisdiction, "the plaintiff must identify a separate contract, regulation, statute, or constitutional provision that provides for money damages against the United States." *Id.*  Stated differently, the plaintiff must state a claim that is based on a provision that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained," *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983) ("*Mitchell II*") (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)), and is "reasonably amenable to the reading that it mandates a right of recovery in damages," *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003).

Like the Tucker Act, the Indian Tucker Act creates a limited waiver of sovereign immunity:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946*,* in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505.  "By enacting this statute, Congress plainly intended to give tribal claimants the same access to the Court of Claims provided to individuals by the Tucker Act." *United States v. Mitchell*, 445 U.S. 535, 539 (1980) ("*Mitchell I*").  Thus, "[i]t follows that 28 U.S.C. § 1505 no more confers a substantive right against the United States to recover money damages

than does 28 U.S.C. § 1491." *Id.* at 540. "To state a claim cognizable under the Indian Tucker Act . . . a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo I*").

## 2.   Motions to Dismiss Pursuant to RCFC 12(b)

Plaintiffs bear the burden of establishing subject matter jurisdiction. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). To survive a motion to dismiss, a plaintiff must establish, by a preponderance of the evidence, that the Court has jurisdiction over its claims. *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). When reviewing such a jurisdictional challenge, the Court must accept all *factual* allegations in the complaint as true and construe the facts in the light most favorable to the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014). The Court must dismiss the action if it determines at any time that it lacks subject matter jurisdiction. *See* RCFC 12(h)(3).

Even if a plaintiff establishes subject matter jurisdiction by alleging entitlement to relief under a money-mandating source of law, the plaintiff must still state a claim upon which the Court can grant relief. "When considering a motion to dismiss a case for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court accepts all well-pled facts as true and draws all reasonable inferences in plaintiff's favor." *Silver Buckle Mines, Inc. v. United States*, 117 Fed. Cl. 786, 791 (2014) (citations omitted). Granting a motion to dismiss for failure to state a claim "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). Denial of the motion is warranted when the complaint presents "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## B.   The Beneficiaries' Claims Must be Dismissed Pursuant to RCFC 12(b)(1) For Lack of Subject Matter Jurisdiction

### 1.   The beneficiaries lack standing to bring their claims

The government requests that the Court dismiss the individual beneficiaries' claims for lack of standing pursuant to RCFC 12(b)(1). Motion at 10. According to the government, the beneficiaries did not suffer an injury in fact; therefore, they do not have standing to bring their individual claims "because that which has allegedly been mismanaged does not belong to the [beneficiaries]." ECF No. 15 ("Def.'s Reply") at 2. The government asserts that the Settlement Act requires the United States to accept title to the New Lands "in trust for the benefit of the Navajo Tribe as part of the Navajo Reservation," and, thus, pursuant to the statute, the United States "holds legal title to the New Lands in trust for the benefit of the Navajo Nation, not the [beneficiaries]." Motion at 12 (internal citations and quotations omitted). The government argues that under the Settlement Act, while the New Lands are to be used for the benefit of the beneficiaries, the New Lands are "are expressly held in trust for the Nation, not individual

Indians." *Id*. Accordingly, the government contends that "when a Tribe is the direct trust beneficiary, individual Tribal members lack the protectable interest necessary to bring mismanagement claims." *Id*. at 11–12 (citing *Hoopa Valley Tribe v. United States*, 597 F.3d 1278, 1284 (Fed. Cir. 2010); *Osage Tribe of Okla. V. United States ("Osage II")*, 85 Fed. Cl. 162, 171–72 (2008). Therefore, the government asserts that because the beneficiaries "do not hold a beneficial interest in any land taken into trust under the Settlement Act," "[n]or does the Settlement Act create any vested individual rights to New Lands revenue for the [beneficiaries]," the beneficiaries lack standing to assert their mismanagement and revenue claims. *Id*. at 13–14.

In response, Plaintiffs argue that the beneficiaries "have standing to assert claims for injuries from maladministration of the New Lands and resulting revenue because section 11(h) [of the New Settlement Act] mandates that the new lands 'shall be used solely for' [the beneficiaries'] benefit." ECF No. 12 ("Pls.' Resp.") at 6. In other words, Plaintiffs argue that because "the Relocation Act mandates land use 'solely for the benefit of' the Relocation Beneficiaries . . . [t]hat recognizes a 'legally protectable interest' for the Relocation Beneficiaries, which gives them standing to assert claims for breach of duties owed directly to them." *Id.* at 9–10 (citing *Osage II*, 85 Fed. Cl. at 170; *Osage Nation v. United States*, 57 Fed. Cl. 392, 394–95 (2003) ("*Osage I*")).

Plaintiffs further assert that "vesting of rights is not relevant to standing" and "alleging that federal conduct 'deprived' Indians of interests that 'they otherwise would have' received suffices for standing." *Id*. at 6–7 (citing *Fredericks v. United States*, 125 Fed. Cl. 404, 413 (2016) (other internal citations omitted)). According to Plaintiffs, the beneficiaries "allege that [the government's] myriad maladministration deprived them of their proper 'sole' beneficial use of and revenue from the New Lands," including "prohibited grazing trespass, using land and allowing land uses without required leases, failure to collect grazing penalties or obtain proper returns for leasing or rights of way, and keeping and spending reduced New Lands revenue rather than collecting, depositing, and investing that in trust for the [beneficiaries]." *Id*. at 7 (internal citations omitted). Plaintiffs claim that these allegations "establish[] injury in fact." *Id*. Additionally, Plaintiffs argue that the "beneficiaries have a legally protected interest in the trust corpus and proper administration thereof, with standing to sue for breach of trust simply if those interests are or may be adversely affected." *Id.* at 8 (citing *Scanlan v. Eisenberg*, 669 F.3d 838, 842, 846 (7th Cir. 2012)) (other internal marks and citations omitted).

Although the Court sympathizes with the beneficiaries' arguments, it disagrees with Plaintiffs and finds that the beneficiaries do not have standing to bring their claims. "Standing is a threshold jurisdictional issue that implicates Article III of the Constitution." *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1328 (Fed. Cir. 2005). According to the Supreme Court, "the irreducible constitutional minimum of standing contains three elements": injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). Under the first prong, "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal marks and citations omitted). Moreover, Plaintiffs, as the party invoking jurisdiction, bear the burden of establishing that standing is present. *Id.*

To prove an invasion of a legally protected interest in the context of a breach of trust claim, "the plaintiffs must show the existence of a trust relationship with the government." *Fletcher v. United States*, 26 F.4th 1314, 1322 (Fed. Cir. 2022). Such a fiduciary relationship exists only when all necessary elements of a common-law trust are present: (1) a trustee (the United States), (2) a beneficiary (Indians), and (3) a trust corpus (Indian lands or funds). *Mitchell II*, 463 U.S. at 206; *Begay*, 16 Cl. Ct. at 127, *aff'd*, 865 F.2d 230. If there is nothing that can be viewed as trust corpus, then a trust relationship does not exist. *See Begay*, 16 Cl. Ct. at 127–28 (finding that individual relocatees did not have a trust relationship with the United States under the Settlement Act when there was "nothing for the [United States] to be a trustee of" because "[a]ll the tangible monetary benefits of the Act were paid to plaintiffs" and the "intangible benefits damages for social, cultural and psychological harms" that plaintiffs sought were not "subject to damage ascertainment bur rather are matters more properly reserved for Congressional consideration and action."). Additionally, "[t]he existence of the general Indian-government trust relationship does not create a property interest where one does not otherwise exist." *Id.* at 128 (citing *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 705–08 (1987)).

Here, the individual beneficiaries have not demonstrated that there has been an invasion of a legally protected interest because they have not established that they, as individuals, have a trust relationship with the United States. The final trust element, corpus, is missing from the instant case because the beneficiaries do not have a legally protected interest in the New Lands under the Settlement Act. Plaintiffs argue that Section 11(h) of the Settlement Act gives the beneficiaries a legally protected interest in the New Lands by stating that the New Lands "shall be used solely for the benefit of" the beneficiaries. Pls.' Resp. at 6. However, this neither gives the beneficiaries a property interest in the New Lands nor creates a trust relationship between them and the government. Rather, it simply gives the beneficiaries a land-use interest. The Settlement Act states that the New Lands "shall be *used* solely for the benefit" of the beneficiaries, not that the New Lands shall be "administered" solely for the benefit of the beneficiaries. Like in *Begay*, there is nothing for the government to be a trustee of here because there are no tangible benefits the individual beneficiaries are individually entitled to under a trust relationship pursuant to the Settlement Act.

Plaintiffs attempt to equate the beneficiaries with the individual headright owners in *Fletcher*. Pls.' Resp. at 9. In *Fletcher*, the Federal Circuit held that individual headright owners in the Osage Tribe had a trust relationship with the United States; therefore, they had standing to bring their individual trust fund mismanagement claims against the government, because the Act for the Division of the Lands and Funds of the Osage Indians in Oklahoma Territory ("1906 Act") "imposes an obligation on the federal government to distribute funds to individual headright owners in a timely (quarterly) and proper (pro rata, with interest) manner . . . ." 26 F.4th at 1324. The circuit explained that:

> [a]lthough [the 1906 Act] establishes that the mineral estate is reserved to the tribe and the preamble of Section 4 describes the trust fund as belonging to the tribe, the subsections of Section 4 explicitly provide that the royalties from the mineral estate are to be placed in the trust account "to the credit of the members" and "distributed

to the individual members" in the same manner as "other moneys held in trust" in the account.

*Id.* at 1322 (quoting Act for the Division of the Lands and Funds of the Osage Indians in Oklahoma Territory, and for Other Purposes, Pub. L. No. 59-321, 34 Stat. 539, 544 (1906)). Plaintiffs argue that the situation is the same here: "[s]o too here, the Relocation Act establishes a trust relationship and standing for the Relocation Beneficiaries since it specifies that the New Lands 'shall be used solely for the[ir] benefit' even though the New Lands are held in trust for the Nation." Pls.' Resp. at 9 (quoting 25 U.S.C. § 640-10(h)).

The Court disagrees. The individual headright owners in *Fletcher* had standing because they were just that: headright *owners*. They suffered an injury in fact because the government mismanaged tribal trust funds that the headright owners were explicitly entitled to under the 1906 Act. The 1906 Act specifically stated that the royalties from the tribe's mineral estate were to be placed in the trust account "to the credit of the members" and "distributed to the individual members" in the same manner as "other moneys held in trust" in the account. 1906 Act, Pub. L. No. 59-321, 34 Stat. 539 (1906). The funds were to be placed "to the credit of the members" "on a basis of a pro rata division among the members of said tribe." *Id.* The 1906 Act further provided that "said credit" was to "draw interest" to be "paid quarterly to the members." *Id.* Thus, the 1906 Act at issue in *Fletcher* clearly created a trust relationship between the government and the individual headright owners by *directly* entitling the headright owners to a specific, tangible, legally protected interest.

The Settlement Act, however, does not entitle the beneficiaries to a similar legally protected interest. The only language in the entire Settlement Act that Plaintiffs can point to in support of their standing argument is a single clause: "such lands shall be used solely for the benefit of Navajo families residing on Hopi-partitioned lands as of December 22, 1974." 25 U.S.C. § 640d-10(h). This does not confer a tangible benefit from the government to the beneficiaries. There is nothing for the government to administer or distribute to the beneficiaries. Unlike the 1906 Act at issue in *Fletcher* that specifically instructed the government to set aside a defined amount of funds from the tribal trust and distribute those funds to individual members of the tribe on a certain timeline, here, the Settlement Act does not obligate the government to provide the beneficiaries with any property or monetary corpus.

Furthermore, an even more important and essential element of a trust relationship "is the intent of a settlor to create the trust." *See Begay*, 16 Cl. Ct. at 128 (holding that members of the Navajo Tribe seeking damages related to their relocation under the Settlement Act were not entitled to damages for breach of trust by the government absent facts suggesting any intent by Congress to create a fiduciary relationship between the individual Indians and the government) (citing RESTATEMENT (SECOND) OF TRUSTS §§ 2, 23, 25 (1959)). Plaintiffs failed to show, or even allude to, any evidence that Congress intended the Settlement Act to create a trust relationship between the government and the individual beneficiaries in relation to the New Lands. There is nothing in the Settlement Act that explicitly instructs the government to administer the tribal trust lands or funds in any specific way for the beneficiaries. It only states that the New Lands "shall be *used* solely for the benefit" of the beneficiaries, and it does not even identify the government as the party who should be using the land for the beneficiaries'

benefit. 25 U.S.C. § 640d-10(h) (emphasis added). Accordingly, there is no trust relationship between the beneficiaries and the government in relation to the New Lands, meaning that there was no trust relationship between the government and the beneficiaries for the government to breach. Therefore, the beneficiaries have not suffered an injury-in-fact and, accordingly, do not have standing to bring their trust mismanagement claims.

### 2.   The beneficiaries are not an "identifiable group" under the Indian Tucker Act

Even if the individual beneficiaries had standing, this Court still lacks subject matter jurisdiction over their claims. The beneficiaries brought their claims to this Court pursuant to the Indian Tucker Act. Compl. ¶ 4. Under the Indian Tucker Act, the Court has jurisdiction over any claim against the United States for money damages "accruing after August 13, 1946, *in favor of any tribe, band, or other identifiable group of American Indians* residing within the territorial limits of the United States or Alaska . . . ." 28 U.S.C. § 1505 (emphasis added). Plaintiffs assert that the Court has jurisdiction over the beneficiaries' claims because the beneficiaries qualify as an "identifiable group" pursuant to the Indian Tucker Act. *See* Pls.' Resp. at 10–11.

The government challenges the Court's Indian Tucker Act jurisdiction over the beneficiaries' claims and argues that the beneficiaries are not an "identifiable group" under the Indian Tucker Act because "they are Navajo citizens and are represented by the Nation." Motion at 14. The government asserts that while Plaintiffs contend that the beneficiaries "have an interest in this matter that is separate from the Navajo Nation," "the Navajo Nation also brings claims challenging the government's management of the New Lands and New Lands revenue, and the Nation represents the Relocatees' interests here as its constituents." *Id.* at 16. The government explains that the "Navajo Nation adequately represents any interests that the Relocatees may have, because the Nation and the Relocatees 'share an interest in maximizing the damages for the breach of trust duties alleged in this action.'" *Id.* (quoting *Osage II.*, 85 Fed. Cl. at 172) (other internal citations omitted).

Plaintiffs respond to the government's argument by asserting that "identifiable groups may be represented by any of their members, including Indian tribes and eligible or enrolled members of Indian tribes." Pls.' Resp. at 11 (internal marks and citations omitted). According to Plaintiffs, "the only controlling question" to qualify as an identifiable group "is whether the claimant group can be identified and have a common claim." *Id.* (citing *Chippewa Cree Tribe of the Rocky Boy's Rsrv. v. United States*, 69 Fed. Cl. 639, 673 (2006)). Plaintiffs argue that the beneficiaries are "identifiable" because "[t]hey are expressly defined by the Relocation Act as 'Navajo families residing on Hopi-partitioned lands as of December 22, 1974' and they in fact have been largely identified per the Relocation Act . . . ." *Id.* at 12 (internal marks and citations omitted). Plaintiffs argue that the beneficiaries' "claims are common because they concern land that is held in trust for the Nation . . . which shall be administered and shall be used solely for their benefit collectively." *Id.* (internal marks and citations omitted). According to Plaintiffs, "[n]o more is required for the Relocation Beneficiaries to be an identifiable group." *Id.*

The Court cannot concur with Plaintiffs. The Court's jurisdiction to hear claims brought by "any Indian tribe, band, or other identifiable group" of Indians developed from Congress' decision in 1946 to establish the Indian Claims Commission (ICC). *See* Act of August 13, 1946,

ch. 959, 60 Stat. 1049, 1050 (codified at 25 U.S.C. §§ 70–70w (1946)) (Indian Claims Commission Act).  "The ICC was established in response to Congressional concern over a growing backlog of Indian claims awaiting jurisdictional grants from Congress, then the sole mechanism available to tribes seeking redress of grievances based on Indian treaties and agreements to bring cases before the Court of Claims." *Chippewa Cree Tribe of the Rocky Boy's Rsrv.*, 69 Fed. Cl. at 671 (citing H.R. Rep. No. 79–1466 (1945)).  Congress' decision to include "other identifiable group[s] of American Indians" as plaintiffs before the ICC "reflected congressional concern that all legitimate claims of the Indians against the United States be provided with a forum and the opportunity to be heard," even if they lacked a formal tribal organization. *Id.* (citing H.R. Rep. No. 79-1466, at 1–2).  Congress similarly extended this Court's jurisdiction to include monetary claims against the United States brought by any "Indian tribe, band, or other identifiable group of American Indians" accruing after the date of the approval of the Act creating the ICC.  Indian Claims Commission Act § 24, 60 Stat. at 1055 (codified at 25 U.S.C. § 70w (Supp. II 1946)).

To qualify as an "identifiable group," a group of plaintiffs does not have to be an "existing political group." *See Chippewa Cree Tribe of the Rocky Boy's Rsrv.*, 69 Fed. Cl. at 673.  Rather, "[t]he controlling question is whether the claimant group can be identified and have a common claim." *Id.*  In other words, when plaintiffs "are no longer organized as a band, the question *then* is whether members, or descendants of members of the [band] as it existed and was recognized at the time of the [statute or treaty at issue], can be identified." *Id.* (emphasis added).  If plaintiffs can be so identified, "*then* any one of their group is authorized by express statute to present" a monetary claim against the United States in this Court as an "identifiable group of American Indians" under the Indian Tucker Act.  *See id.* (emphasis added).  In short, if a claimant group is unable to bring suit in this Court as a tribe, they can still bring suit under the Indian Tucker Act as an "identifiable group" if they were once part of—or are lineal descendants of someone who was once part of—an organized tribe that no longer exists or represents the interests of the claimant group.  *See id.* (finding that Pembina Band descendants of the Chippewa Indians were an "identifiable group" in the absence of formal organization as a tribe because they were an organized band at the time their claim arose); *accord Snoqualmie Tribe of Indians v. United States,* 178 Ct. Cl. 570, 579 (1967) (finding that the Skykomish Tribe qualified as an "identifiable group" able to bring a representative claim on its own behalf where the Skykomish Tribe was a separate and identifiable group at the time of negotiations of the treaty at issue, and subsequently went out of existence as a tribe); *Wolfchild v. United States*, 62 Fed. Cl. 521, 540 (2004), *rev'd on other grounds*, 559 F.3d 1228 (Fed. Cir. 2009) (finding that lineal descendants of the loyal Mdewakanton qualified as an "identifiable group of American Indians" under the Indian Tucker Act, stating that "[although] the lineal descendants are unable to sue as a tribe because they necessarily had to sever their tribal relations . . . they were and still remain an identifiable group of American Indians").

However, if the beneficiaries "do not lack formal organization as a tribe" but are "members of [a] plaintiff-tribe that is a party to [the] litigation" that represents the beneficiaries' "interests as its constituents," the beneficiaries are "simply not an 'identifiable group' pursuant to 28 U.S.C. § 1505, but are, rather, members of a tribe." *Osage II*, 85 Fed. Cl. at 168 (finding that a group of Osage Indian headright owners who were original allottees or descendants of original allottees, were not an "identifiable group" under the Indian Tucker Act because the individuals

within that group were members of the Osage tribe and were therefore already represented by the tribe in its suit against the government for mismanagement of moneys due from tribal oil leases).

Here, the beneficiaries "consist[] of over 4,000 Navajo families residing on Hopi-partitioned land as of December 22, 1974." Compl. ¶ 1 (internal quotations omitted). Thus, similar to the claimant group in *Osage II*, these individual beneficiaries are members of a federally recognized Indian Tribe, the Navajo Nation, which is a party to this litigation and can represent its members interests in this matter (and Plaintiffs offer no evidence to suggest otherwise). *See* 85 Fed. Cl. at 168. Additionally, just like the claimant group in *Osage II*, the beneficiaries are materially different from the claimants in previous cases in which the claimants qualified as an "identifiable group." *See id.* For example, unlike the claimants in *Chippewa Cree* and *Wolfchild*, the beneficiaries do not lack formal organization as a tribe; rather, as the complaint states, they are members of the Navajo Nation. Also, unlike in *Chippewa Cree* and *Wolfchild*, the Navajo Nation, a federally recognized organization of which the beneficiaries are members, is a party to this litigation.

Plaintiffs try to distinguish this case from *Osage II* by arguing that the Navajo Nation does not represent the beneficiaries "as its constituents." Pls.' Resp. at 12. However, Plaintiffs do not offer any further explanation as to why this is so. Plaintiffs state that "the Nation only asserts its own claims and does not represent the Relocation Beneficiaries, who assert their own claims for failure to use the New Lands solely for their benefit." *Id.* But Plaintiffs fail to explain why the Nation cannot also assert the beneficiaries' claims in a representative capacity. Plaintiffs try to further argue that *Osage II* is "no longer good law" because it "was based on a prior ruling that only the tribe was the real party in interest and direct trust beneficiary," and "the Federal Circuit recently held that Osage and its members can separately assert their own interests under that statutory trust in which they both have interests." *Id.* (referencing *Fletcher*, 26 F.4th at 1314). However, the Federal Circuit in *Fletcher* found jurisdiction under the Tucker Act and, therefore, "[did] not address Indian Tucker Act jurisdiction and who constitutes an 'identifiable group of Indians.'" 26 F.4th at 1324.

Furthermore, Plaintiffs fail to identify any legal authority or case in which this Court or the Federal Circuit has held that members of a currently-recognized tribe constitute an "identifiable group of American Indians" in accordance with the Indian Tucker Act. Although the requirement to bring a claim under the Indian Tucker Act is not predicated on "particular tribal citizenship," previous case law has repeatedly shown that plaintiffs are considered an "identifiable group" when they are unable to sue as a tribe or there is no existing tribal organization through which plaintiffs can assert their claims. *See Chippewa*, 69 Fed. Cl. at 673–74; *see also Wolfchild*, 62 Fed. Cl. at 539–40; *Snoqualmie Tribe of Indians,* 372 F.2d at 956–57. Here, the beneficiaries can sue as an existing tribal organization: the Navajo Nation (conveniently a plaintiff to this litigation), which represents the beneficiaries' interests. Therefore, the Court finds that Plaintiffs have failed to demonstrate that the beneficiaries are an "identifiable group of American Indians" under the Indian Tucker Act.

**C.      The Court Lacks Jurisdiction over any of the Nation's Claims that Accrued Prior to August 26, 2014**

In its motion to dismiss, the government asserts that the Nation seeks to relitigate claims that predate the 2014 Navajo Settlement Agreement.  Motion at 17.  The government argues that "claim preclusion and the doctrines of waiver and release block" the Nation from relitigating any trust mismanagement claims that accrued prior to August 26, 2014, because the Nation waived and released those claims by signing the 2014 Navajo Settlement Agreement.  *Id.* at 17–19.  In response, Plaintiffs acknowledge that the "Nation cannot assert claims which predate its 2014 Settlement."  Pls.' Resp. at 14 (citing Compl. ¶ 157).  However, Plaintiffs clarify that any pre-Settlement claims in their complaint are those of the beneficiaries, not the Nation.  *Id.*  In other words, Plaintiffs argue that while "[t]he 2014 Settlement precludes later assertion of waived and released claims only for the Nation as a party to that," it does not "waive, release, or preclude the Relocation Beneficiaries' claims."  *Id.*

The Court does not read the complaint or Plaintiffs' briefing on the motion to dismiss as asserting any pre-2014 Settlement Agreement claims on behalf of the Nation.  The Court agrees with Plaintiffs that any pre-2014 Settlement claims present in the complaint are those of the beneficiaries, which the Court is dismissing those for lack of subject matter jurisdiction as discussed above.  However, to any extent that the Nation does assert any trust mismanagement claims that accrued prior to the 2014 Settlement Agreement, the Court dismisses those claims pursuant to the doctrines of claim preclusion, waiver, and release.  *See Ford-Clifton v. Dep't of Veterans Affs.*, 661 F.3d 655, 660 (Fed. Cir. 2011) ("Pursuant to the doctrine of *res judicata,* a final judgment on the merits bars a second action involving the same parties and the same claim.  It is widely agreed that an earlier dismissal based on a settlement agreement constitutes a final judgment on the merits in a *res judicata* analysis.") (internal citations omitted); *Navajo Settlement Agreement* ¶ 4 (stating that in consideration for payment, the Navajo Nation "waives, releases, and covenants not to sue in any administrative or judicial forum on any and all claims, causes of action . . . known or unknown . . . that are based on the harms or violations occurring before the date of [the] Settlement Agreement . . ." relating to the government's management of Navajo trust resources).

**D.      The Court denies the government's motion to dismiss the Nation's leasing and rights-of-way claims**

In their complaint, Plaintiffs allege that the United States has a fiduciary duty to the Nation regarding the leasing of property and the granting of rights-of-way on the New Lands.  *See, e.g.*, Compl. ¶¶ 68–69, 105.  The government contends, however, that no such fiduciary duty exists, and, even if it did have such a duty, the substantive source of law creating that duty is not money mandating.  *See generally* Motion.  Accordingly, the government requests that the Court dismiss the Nation's leasing and rights-of-way claims (counts two and three of the complaint) for lack of subject matter jurisdiction.  *Id.* at 27.

In response, Plaintiffs assert that the Settlement Act "readily imposes enforceable fiduciary duties for administration and use of the New Lands, including for leasing and rights of way."  Pls.' Resp. at 19.  According to Plaintiffs, the Settlement Act, in particular, provides that

> lands transferred or acquired pursuant to this section *shall be administered by the Commissioner* until relocation under the Commission's plan is complete and such lands shall be used solely for the benefit of Navajo families residing on Hopi-partitioned lands as of December 22, 1974: *Provided*, That *the sole authority for final planning decisions regarding the development of lands acquired pursuant to this subchapter shall rest with the Commissioner* until such time as the Commissioner has discharged his statutory responsibility under this subchapter.

25 U.S.C. § 640d-10(h) (emphasis added); Pls.' Resp. at 19. Plaintiffs also assert that because the Settlement Act "transferred to ONHIR 'all powers and duties of the Bureau of Indian Affairs [("BIA")] from Public Law 99-190 (99 Stat. at 1236) that relate to the relocation of' Navajos from HPL," "ONHIR 'may issue leases and rights of way for housing and related facilities to be constructed on the lands which are subject to Section 11(h)' of the [Settlement] Act." Pls.' Resp. at 20. Plaintiffs further argue that these "powers and duties over leasing and rights of way are not separate from Section 11(h)'s mandate for administration of the New Lands." *Id.* According to Plaintiffs, these Settlement Act provisions "must be read in their context and with a view to their place in the overall statutory scheme," *id.* (quoting *Sucic v. Wilkie*, 921 F.3d 1095, 1098 (Fed. Cir. 2019)), and, when read together, the "provisions prescribe and define ONHIR's 'full responsibility' to 'administer' the New Lands, including enforceable fiduciary duties for leasing and rights of way," *id.* at 21 (quoting 25 U.S.C. §§ 640d-10(h), 640d-11(c)(2)(A)). For the reasons discussed below, Plaintiffs have met their burden of establishing that a money-mandating fiduciary relationship exists regarding leasing and rights-of-way on the New Lands.

Under the doctrine of sovereign immunity, the United States cannot be sued without its consent. *United States v. Navajo Nation (Navajo II)*, 556 U.S. 287, 289 (2009). However, the United States has waived its sovereign immunity and consented to suit in a variety of statutes, including so-called Indian Tucker Act, which gives this Court jurisdiction over any claim against the federal government "in favor of any tribe . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group." 28 U.S.C. § 1505. Although the Indian Tucker Act waives the United States' sovereign immunity and provides the Court with jurisdiction for claims premised on other sources of law, it does not itself create any substantive rights. *Navajo II*, 556 U.S. at 290 ("Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law . . . ."). Therefore, it is insufficient for a tribal plaintiff to simply point to the Indian Tucker Act to invoke this Court's jurisdiction; rather, a plaintiff must also invoke a substantive source of law that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell II*, 463 U.S. at 216–17.

In Indian Tucker Act cases, a two-part test is used to determine whether the Court has jurisdiction. First, a tribal plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo I*, 537 U.S. at 506. "At the first step, a statute or regulation that recites a general trust relationship between the United States and the Indian People is not enough to

establish any particular trust duty." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (citing *Mitchell I*, 445 U.S. at 542–44). Instead, "[t]o establish that the United States has accepted a particular fiduciary duty, an Indian Tribe must identify statutes or regulations that both impose a specific obligation on the United States and bear the hallmarks of a conventional fiduciary relationship." *Id.* (citing *Navajo II*, 556 U.S. at 301) (internal alterations and quotations omitted). If the first step is satisfied, "the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes.'" *Navajo II*, 556 U.S. at 291 (alterations and quotations omitted). At this second step, general "principles of trust law might be relevant 'in drawing the inference that Congress intended damages to remedy a breach.'" *Id.* at 290 (quoting *White Mountain Apache Tribe*, 537 U.S. at 477). In fact, according to the Supreme Court, in cases in which there is "the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for breaches of trust." *Mitchell II*, 463 U.S. at 226 (citing treatises on trusts).

### 1.  The Settlement Act gives the United States a specific, fiduciary duty regarding leases and rights-of-way on the New Lands

With regard to the first jurisdictional threshold, Plaintiffs have demonstrated that the United States (acting through ONHIR) has a fiduciary duty to the Navajo Nation regarding leases and rights-of-way on the New Lands. Whether this trust relationship extends beyond administering leases and rights-of-way is not a question at issue in counts two and three of Plaintiffs' complaint. It is clear, however, that the Settlement Act, statutes cross-referenced in the Settlement Act, regulations, and the ONHIR Management Manual all establish a specific fiduciary responsibility regarding leases and rights-of-way.

The government first seeks to avoid its fiduciary duty and have counts two and three dismissed by attempting to analogize this case to *Mitchell I*, a case in which the plaintiffs did not establish the requisite fiduciary duty to allow their claims to proceed. Motion at 30. In *Mitchell I*, individual Indians in the Quinault Tribe, who were allotted land under the Indian General Allotment Act of 1887, brought suit against the United States for alleged mismanagement of timber resources on the Quinault Reservation. *Mitchell I*, 445 U.S. at 536–37. The Supreme Court held that "the [General Allotment] Act created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Id.* at 542. The Supreme Court explained that while the Act instructs the United States to "hold the land . . . in trust for the sole use and benefit of the [allottees]," it does not "unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands" because the Act also "indicate[s] that the Indian allottee, and not a representative of the United States, is responsible for using the land for agricultural or grazing purposes" and "the legislative history of the Act plainly indicates that the trust Congress placed on allotted lands is of limited scope. *Id.* at 541–43.

However, the instant case differs significantly from *Mitchell I* in that the Settlement Act does more than simply instruct the United States to hold the New Lands in trust for the Nation. Rather, the Settlement Act specifically directs the United States to "administer" the New Lands

and provides that the government (*i.e.*, ONHIR) "shall" have the "sole authority for final planning decisions regarding the development of [the New Lands.]"  25 U.S.C. § 640d-10(h).  According to the Settlement Act, this planning authority includes the authority to issue leases, rights-of-way, and other land use approvals previously exercised by the Secretary of the Interior.  25 U.S.C. § 640d-11(c)(2)(a) (transferring to ONHIR "all powers and duties of the Bureau of Indian Affairs derived from Public Law 99-190 (99 Stat. at 1236) that relate to the relocation of members of the Navajo Tribe . . .").  In other words, the Settlement Act goes beyond the bare trust relationship created by the statute at issue in *Mitchell I* by clearly giving the United States the exclusive and final administrative power over leasing and rights-of-way on the New Lands.  This is the sort of unambiguous directive that was missing in *Mitchell I* and gives the government a specific fiduciary duty to administer these particular aspects of the New Lands as a trustee.  *See Mitchell II*, 463 U.S. at 224 (holding that statute and regulations giving federal government "full responsibility" to manage property for benefit of Indians established fiduciary relationship between government and Indians, breach of which gave rise to substantive claim for money damages against government).  This is in stark contrast to the statute at issue in *Mitchell I*, which provided that "the [Indian] allottee, and not the United States, was to manage the land." *Mitchell I*, 445 U.S. at 543.  Moreover, the government has acknowledged this duty in the ONHIR Management Manual: "[i]n order to develop the New Lands for resettlement [ONHIR] will withdraw sections of land for residential use and other purposes compatible with the master plan and shall grant appropriate requests for rights-of-way, homesite leases, business and community services facilities, and other purposes compatible with the plan."  OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION, MANAGEMENT MANUAL ("OMM") 259 (2011), https://www.onhir.gov/assets/documents/mangement-manual/ONHIR-Management-Manual.pdf.

The government argues that this case cannot follow "*Mitchell II* and its progeny," because the Settlement Act "differ[s] significantly from the statues and regulations that required Interior to manage Tribal timber resources in *Mitchell II*," Def.'s Reply at 12, which "addressed virtually every aspect of forest management" and gave the Secretary of the Interior a "pervasive role in the sales of timber from Indian lands . . . ."  *Mitchell II*, 463 U.S. at 219–20.  Contrary to the government's argument, however, such express language is not needed to create a fiduciary relationship.  Instead,

> [w]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Id.* at 225 (quoting *Navajo Tribe of Indians v. United States,* 224 Ct. Cl. 171, 183 (1980)).  Furthermore, if the language of a statute specifically gives the government "final control" over the trust corpus, and the government assumes that trust responsibility, it is assuming a fiduciary duty to appropriately manage the trust corpus.  *See W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States*, 143 Fed. Cl. 545, 601–602 (2019) (holding that the statute and regulations cited by plaintiffs "clearly g[a]ve the Federal Government full responsibility to manage tribal trust funds" because the government "retained final control and supervision of

plaintiffs' tribal trust funds" and "the ultimate decision on how to invest tribal trust funds resided with the government, not the tribes").

Here, the Settlement Act gives the government full, exclusive, and final administrative control over the development of the New Lands.  25 U.S.C. § 640d-10(h) ("The lands transferred or acquired pursuant to this section shall be administered by the Commissioner. . . the sole authority for final planning decisions regarding the development of lands acquired pursuant to this subchapter shall rest with the Commissioner . . . .").  Moreover, the complaint plausibly alleges that the government has clearly taken control and supervisory authority over leasing of land and permitting rights-of-way on the New Lands.  *See, e.g.*, Compl. ¶¶ 71–95 (discussing various leases or other occupancy of the New Lands approved or allowed by ONHIR); Compl. ¶¶ 106–08 (discussing rights-of-way permitted on the New Lands by ONHIR).  And the ONHIR Management Manual confirms this.  *See, e.g.*, OMM at 260, 267–68 (stating that with regard to leases and rights-of-way ONHIR will grant leases and rights-of-way subject only to the Nation's "comments," which, in the case of leases, ONHIR "will consider . . . and may modify the agreement accordingly" and, in the case of rights-of-way, ONHIR "will respond to any concerns of a technically valid nature").

The government rejoins that "the vague mandate in § 640d-10(h) does not establish any 'specific fiduciary or other dut[y,]' regarding leasing and rights-of-way on the New Lands," Motion at 30 (internal citations omitted), and asserts that the Settlement Act does not "impose the specific leasing and rights-of-way duties that the United States is alleged to have failed to perform," *id.* at 31.  In other words, the government's basic argument is as follows: because the Settlement Act does not state that the government *shall* issue leases and rights-of-way, there is no fiduciary duty to either convey leases and rights-of-way or manage leases and rights-of-way effectively if the government choses to convey them.  The government's argument misses the mark.  As mentioned above, the Settlement Act clearly instructs ONHIR to administer the New Lands.  In context, the use of the term "administer[]" in the Act clearly refers to making planning decisions regarding the development of the New Lands so that the New Lands will be meaningfully habitable for the Relocatees.  *See* 25 U.S.C. § 640d-10(h).  In turn, to facilitate ONHIR's duty to administer, ONHIR is given the authority to issue leases and rights-of-way for housing and related facilities.  Even though the authority to issue leases and rights-of-way is written in the permissive rather than the imperative, this does not mean that the United States (through ONHIR) lacks a fiduciary duty to the Nation with regard to developing the New Lands through, in part, issuing leases and rights-of-way.  The fiduciary duty here is to administer the New Lands through, *inter alia*, the issuance of leases and rights-of-way, and the United States clearly understands it has this duty because it promulgated the ONHIR Management Manual, which provides the procedures for the issuance of leases and rights-of-way.  In other words, the Settlement Act contains all the "hallmarks of a more conventional fiduciary relationship."  *White Mountain Apache*, 537 U.S. at 473.  Those hallmarks are: "a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property."  *Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, ___ F.4th ___, 2024 WL 1786068 at *9 (Fed. Cir. 2024).

The government also attempts to analogize this case to *Begay*.  Motion at 31.  In *Begay*, relocatees under the Settlement Act brought suit against the United States for cultural, social, and

psychological injuries they contended were traceable to their relocation under the Settlement Act. *See generally* 16 Cl. Ct. 107. The plaintiffs argued "that § 640d–14[4] [of the Settlement Act] created a fiduciary duty upon the Commission to provide 'decent, safe and sanitary' replacement dwellings." *Id.* at 126. However, the section of the Settlement Act relied upon by the *Begay* plaintiffs also "fixes a limitation on the amount of benefits to be paid." *Id.* As a result, Judge Lyndon held, and the Federal Circuit affirmed, that "section [640d–14 of the Settlement Act] can hardly be read as creating an all encompassing trust duty . . . to ensure that 'decent, safe and sanitary' housing was provided when it specifically limited the dollar amount of benefits relocation families were entitled to," and the *Begay* plaintiffs had already "been paid the full amount of the monetary benefits they were entitled to under the Act." *Id.* at 127, 129. Additionally, as discussed earlier in this opinion, Judge Lyndon held that there was nothing in the case that could be "reasonably be viewed as a trust corpus" because "all the tangible monetary benefits of the Act [*i.e.*, bonus money and homes] were paid to the plaintiffs" "free and clear." *Id.* at 128.

The instant case differs from *Begay* in that sections 640d-11(c)(2)(A) and 640d-10(h) of the Settlement Act specifically identify development of the New Lands through leasing and rights-of-way as a trust corpus that is subject to administration. 25 U.S.C. §§ 640d-10(h), 640d-11(c)(2). Unlike the specified amount of bonus money and homes that the government *already gave* to the plaintiffs in *Begay* pursuant to the Settlement Act, the development of the New Lands by "mak[ing] final planning decisions," including issuing leases and rights-of-way, are an ongoing trust corpus that section 640d-10(h) instructs the ONHIR to "administer[]" "until relocation under the Commission's plan is complete." Put simply, the government in *Begay* had a fiduciary duty to provide the plaintiffs with a specified and limited monetary benefit, and once they did so, their fiduciary duty was complete. Here, however, the United States has an ongoing and current fiduciary duty to "administer[]" the New Lands and make "final planning decisions" regarding the New Lands, which includes "issuing leases and rights of way." 25 U.S.C. §§ 11(c)(2)(A), 640d-10(h).

Rather than the cases cited by the government, this case is more analogous to *United States v. White Mountain Apache Tribe*. At issue in *White Mountain Apache* was a statute requiring that the "'former Fort Apache Military Reservation' be 'held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose.'" 537 U.S. at 469 (quoting Pub. L. No. 86–392, 74 Stat. 8). In 1999, the Tribe sued the United States for breach of fiduciary duty to "maintain, protect, repair and preserve" the trust property. *Id.* (quoting App. to Pet. for Cert. 37a). The government moved to dismiss for lack of subject matter jurisdiction because, according to the government, the Tribe did not cite to a statue or regulation that imposed a legal obligation on the government

---

[4] "The Commissioner shall . . . pay to each head of a household whose household is required to relocate pursuant to this subchapter an amount which, when added to the fair market value of the habitation and improvements purchased under subsection (a) of this section, equals the reasonable cost of a decent, safe, and sanitary replacement dwelling adequate to accommodate such household." 25 U.S.C. § 640d-14(b)(2).

to maintain or restore the property. *Id.* at 470. The Supreme Court held that "[t]he 1960 Act goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable in damages for breach." *Id.* at 474.

According to the Supreme Court, a specific fiduciary relationship existed between the government and the Tribe because the 1960 Act "expressly defines a fiduciary relationship in the provision that Fort Apache be 'held by the United States in trust for the White Mountain Apache Tribe,'" *id.* at 474–75 (quoting 74 Stat. 8), and "invest[s] the United States with discretionary authority to make direct use of portions of the trust corpus," and the government "availed itself of its option" to do so. *Id.* at 475. Essentially, the government owed a fiduciary duty to the Tribe to maintain and preserve the trust corpus because, under the statute, the trust corpus was subject to the government's actual use, and the United States not only exercised daily supervision of the trust corpus, but also enjoyed daily occupation, and so "obtained control at least as plenary as its authority over the timber in *Mitchell II*." *See id.*

Similarly, here, the government has a fiduciary duty regarding leases and rights-of-way on the New Lands because the Settlement Act clearly defines a fiduciary relationship between ONHIR and the Navajo Nation, authorizes ONHIR to "issue leases and rights of way," and ONHIR avails itself of that authorization. For example, the Settlement Act instructs the government to hold the New Lands "in trust for the benefit of the Navajo Tribe," 25 U.S.C. § 640d-10(a)(2), to "administer" the New Lands," and gives it "sole authority for final planning decisions" regarding the New Lands. 25 U.S.C. § 640d-10(h). It also gives the government the power to issue leases and rights-of-way on the New Lands. 25 U.S.C. § 640d-11(c)(2)(A). Like in *White Mountain Apache,* in which the government enjoyed daily occupation and supervision of the trust corpus, here, ONHIR does the same: "ONHIR itself occupies and uses 4 properties without leases [on the New Lands], including a headquarters and New Lands office and two structures on the Padres Mesa Demonstration Ranch." GAO, *ONHIR: Executive Branch and Legislative Action Needed for Closure and Transfer of Activities*, No. GAO-18-266, at 44 (April 2018) ("2018 GAO Report"); *see also* Compl. ¶ 75. Moreover, ONHIR operates the Padres Mesa Demonstration Ranch on the New Lands, including "purchasing cattle, hir[ing] an employee to manage the ranch's operations and contract[ing] cowboys to work on the ranch. ONHIR sells the cattle raised on the ranch and uses the proceeds to help pay for ranch operations." 2018 GAO Report at 9. Additionally, according to the complaint, ONHIR also occupies other "Ranch buildings" including "a house where meetings and trainings are held and where the Ranch manager stays at no charge for five or more nights per week in accordance with his hiring agreement." Compl. ¶ 75.

Furthermore, like the government in *White Mountain Apache*, ONHIR has opted to avail itself of its discretionary authority to issue leases and rights-of-way in carrying out its duty to administer the New Lands. The complaint alleges that ONHIR issued leases to entities including the Painted Desert Inn, the Federal Aviation Administration,[5] the Sanders Unified School District, and rights-of-way to entities including US West Communications, Continental Electric Cooperative, Inc., and Bluebird Resources Company, LLC. *See e.g.*, *id.* ¶¶ 71, 99, 106.

---

[5] The complaint alleges that the Federal Aviation Administration originally occupied property on the New Lands with a formal lease but has occupied property on the New Lands since 2011 without a written lease. Compl. ¶ 76.

Furthermore, ONHIR's Management Manual provides detailed instructions on how leases and rights-of-way on the New Lands are to be applied for and approved.  In fact, according to the manual, ONHIR has approval power over leases and rights-of-way, which aligns with the Settlement Act's instruction that the government "shall" have the "sole authority for final planning decisions" regarding the New Lands.  *See* OMM at 259–261, 263–68.  The New Lands, just like the trust corpus in *White Apache*, are clearly subject to the government's daily use, occupation, and supervision.

This plenary government control is indistinguishable to that exercised by the government in *White Mountain Apache* and *Mitchell II*, indicating that while the Settlement Act might not use mandatory language instructing the government to manage leases and rights-of-way, the United States still accepts a fiduciary duty when it exercises the requisite government control. *White Mountain Apache Tribe*, 537 U.S. at 467 ("Although the 1960 Act, unlike the statutes cited in [*Mitchell I*], does not expressly subject the Government to management and conservation duties, the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the Government as trustee.").

Finally, the Court cannot ignore the obvious.  The Department of the Interior is the primary federal agency charged with carrying out the United States' trust responsibility to Indians.  Yet, in the Settlement Act, Congress created a completely separate, independent agency in the Executive Branch to administer the New Lands.  25 U.S.C. § 640d-11(a).  It seems counterintuitive that Congress would specifically create a smaller, independent agency—outside of the Department of the Interior that typically manages tribal trusts—to administer the New Lands, if Congress only intended to create a general, bare trust relationship with the Nation regarding the New Lands.  In other words, it would be nonsensical for Congress to go out of its way to establish a brand-new federal agency if it did not intend to create the trust relationship that the complaint alleges exists.

## 2.  The Settlement Act mandates compensation for damages if the government breaches its fiduciary duty regarding leases and rights-of-way

Next, the government argues that even if the Settlement Act "clear[s] the first hurdle for Tucker Act jurisdiction," it nonetheless "fall[s] at the second [threshold]" because "[n]one of the[] statutory sections contain an express provision for monetary relief, nor do they contemplate monetary relief."  Def.'s Reply at 12.  The government asserts that these sections of the Settlement Act are not "money-mandating" because Congress did not "clearly set out the requirements controlling the government's responsibilities toward [leases and rights of way]." Motion at 32 (citing *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 89 (2002)).  The government further asserts that section 640d-10(h) of the Settlement Act cannot "be fairly interpreted as mandating compensation" because it does not instruct the government to manage "monetary" resources like the General Allotment Act did in *Mitchell II*.  Def.'s Reply at 13–14 (citing *Mitchell II*, 463 U.S. at 227 (holding that the Secretary's duty to "manage Indian resources so as to generate proceeds for the Indians" recognized a damages remedy for breach of that duty because "[i]t would be anomalous to conclude that these enactments create a right to the value of certain resources when the Secretary lives up to his duties, but no right to the value of the

resources if the Secretary's duties were not performed")).  The government's argument, however, skirts around the reality of the case law.

Because the Court has determined that the United States has a fiduciary duty with regard to the administration of leases and rights-of-way, under prong two the Court must further determine whether the Settlement Act and the sources of law interrelated to the Act also "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell II*, 463 U.S. at 218.  "This 'fair interpretation' rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity." *White Mountain Apache*, 537 U.S. at 472.  In order to satisfy this requirement, the Settlement Act "need not explicitly provide that the right or duty it creates is enforceable through a suit for damages." *Navajo II*, 556 U.S. at 290 (emphasis omitted).  Instead, "[i]t is enough . . . that [the Settlement Act] be reasonably amenable to the reading that it mandates a right of recovery in damages." *White Mountain Apache*, 537 U.S. at 473; *see also Mitchell II*, 463 U.S. at 217 n.16 ("[T]he substantive source of law may grant the claimant a right to recover damages either expressly or by implication." (internal quotation marks and citation omitted)).  Moreover, the Supreme Court has instructed that when determining whether prong two is satisfied, general "principles of trust law might be relevant 'in drawing the inference that Congress intended damages to remedy a breach.'" *Navajo II*, 556 U.S. at 290 (quoting *White Mountain Apache Tribe*, 537 U.S. at 477).  Indeed, the Supreme Court has "consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." *Mitchell II*, 463 U.S. at 226.  In other words, "[g]iven the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Id.*

Here, general principles of trust law indicate that the Settlement Act can fairly be interpreted as mandating compensation for a breach of the leasing and rights-of-way duties it imposes.  Thus, the Nation, as the beneficiary of the trust, "is entitled to recover damages for improper management of the trust" and "enjoy[s] the right of an injured beneficiary to seek damages for alleged breaches of the fiduciary obligations that are defined by the statutes and regulations that give the federal government the responsibility to manage Indian [] resources for the Indians' benefit." *Confederated Tribes of Warm Springs Rsrv. of Oregon v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001).  In short, "[i]t is well established that a trustee is accountable in damages for breaches of trust." *Mitchell II*, 463 U.S. at 226 (citing RESTATEMENT (SECOND) OF THE LAW OF TRUSTS §§ 205–212 (1959); G. BOGERT, THE LAW OF TRUSTS & TRUSTEES § 862 (2d ed. 1965); 3 A. SCOTT, THE LAW OF TRUSTS § 205 (3d ed. 1967)).

The Settlement Act gave ONHIR sole authority and final administrative power over the development of the land that ONHIR holds in trust for the Nation, which includes the duty to manage leases and rights-of-way.  It would be counterintuitive for the Settlement Act to give the Nation this benefit when ONHIR successfully completes their duties regarding the development of the New Lands, but then deny the Nation its right to that benefit if ONHIR fails to perform its fiduciary duty.  *See Mitchell II,* 463 U.S. at 227 ("It would be anomalous to conclude that these enactments create a right to the value of certain resources when the Secretary lives up to his duties, but no right to the value of the resources if the Secretary's duties are not performed."

(citing *Mitchell I,* 445 U.S., at 550 (White, J., dissenting) ("Absent a retrospective damages remedy, there would be little to deter federal officials from violating their trust duties, at least until the allottees managed to obtain a judicial decree against future breaches of trust.")).

The government continues its *Begay*-related argument from step one by suggesting that Judge Lydon, in *Begay,* "held that money-mandating benefits under the [Settlement] Act include payments for 'purchasing the relocatees' property, § 640d-14(a); replacement dwellings, § 640d-14(b)(2); moving expenses, § 640d-14(b)(1) and relocation bonuses, § 640d-13(b)." Motion at 32 (citing *Begay*, 16 Cl. Ct. at 121). The government goes on to imply that the Federal Circuit in *Begay,* later held that "[o]ther than those specific relocation benefits provided for in §§ 640d-13 and 14 (which Plaintiffs do not cite), . . . the Settlement Act cannot be 'fairly interpreted as mandating compensation by the Federal Government.'" *Id.* at 32–33 (citing *Begay*, 865 F.2d at 231). The government's implication is, however, incorrect.

In *Begay*, the plaintiffs argued that the government had a fiduciary duty to provide counseling and decent, safe, and sanitary housing. *See Begay*, 16 Cl. Ct. at 115. In support of this argument, the *Begay* plaintiffs cited completely different sections of the Settlement Act than those at issue here. *Id.* at 121. Judge Lydon held, and the Federal Circuit affirmed, that Congress did not intend "to create a trust relationship between plaintiffs and [ONHIR] by passage of the [Settlement] Act, the breach of which would give rise *to the type of money damage claims against the government asserted by plaintiffs in their complaints*." *Id.* at 130 (emphasis added). In other words, as pointed out by Plaintiffs, and conveniently overlooked by the government, the *Begay* decisions only held that the particular provisions of the Settlement Act at issue in *Begay*, which addressed housing and counseling, were not money-mandating. Inconveniently for the government, the Settlement Act provisions and the fiduciary duties at issue here are completely different than those at issue in *Begay*. *See* Pls.' Resp. at 24. Therefore, *Begay* holds no weight regarding whether sections 640d-10(h) and 640d-11(c)(2)(A) of the Settlement Act "can be fairly interpreted as mandating compensation" as a result of a breach of the government's leasing and rights of way duties.

In addition, as discussed earlier, the government dwells on the argument that section 640d-11(c)(2)(A) of the Settlement Act authorizes, rather than mandates, ONHIR to "issue leases and rights of way." Motion at 31–32. The government does not explicitly argue that this permissive authorization indicates that the provision is not money-mandating. Rather, it simply makes the assertion that "[s]uch discretionary language cannot form the basis of a specific and enforceable duty." Motion at 32. However, when citing to *Hopi Tribe* and *Wolfchild* as its support for this assertion, the government refers to those cases as holding that when a statute uses discretionary, authorizing language, that statute is not money-mandating. Accordingly, the Court addresses this issue in turn.

Although section 640d-11(c)(2)(A) (through incorporation of Public Law 99–190) provides that ONHIR "*may* issue leases and rights of way" on the New Lands, that discretionary language does not automatically prevent the provision from being money-mandating, as the government suggests. Rather, "the mere fact that a statute is discretionary does not end the matter. Instead, the court must examine whether the plain language is overcome by . . . obvious references from the structure and purpose of the statute . . . ." *Hopi Tribe*, 55 Fed. Cl. at 87–88

(citing *McBryde v. United States*, 299 F.3d 1357, 1362 (Fed. Cir. 2002); quoting *United States v. Rodgers*, 461 U.S. 677, 706 (1983)).  In fact, "use of the word 'may' does not, by itself, render a statute wholly discretionary, and thus not money-mandating."  *McBryde*, 299 F.3d at 1362.

Here, examining the overall structure and purpose of the Settlement Act clearly indicates that ONHIR has a specific fiduciary duty to administer the New Lands, including regarding issuing leases and rights-of-way.  This duty, if breached, provides for money damages.  In fact, the United States has repeatedly been found to owe various money-mandating fiduciary duties to Indian plaintiffs.  *See e.g., Brown v. United States*, 86 F.3d 1554, 1563 (Fed. Cir. 1996) (holding that the Secretary of Interior owed a fiduciary, money-mandating duty to members of Salt River Pima-Maricopa Indian Community regarding commercial leases under the Long-Term Leasing Act); *Mitchell II*, 463 U.S. at 208 (holding that the Secretary of Interior was accountable in money damages for alleged breaches of trust in connection with its management of forest resources on allotted lands of the Quinault Reservation); *Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726, 741–42 (2011) (holding that the Secretary of Interior breached money-mandating fiduciary duties by failing to maximize trust income by prudent investment and pool Nation's trust funds with those of other tribes to maximize investment);  *Confederated Tribes & Bands of the Yakama Nation v. United States,* 153 Fed. Cl. 676, 707 (2021) (holding that the Secretary of Interior had a money-mandating fiduciary duty to manage forests on Yakama  tribal land that the government held in trust); *White Mountain Apache Tribe*, 537 U.S. at 465 (holding that the Secretary of Interior had a money-mandating fiduciary duty to maintain and preserve a fort that the government held in trust for the tribe).

Accordingly, the Court finds that the Settlement Act creates a money-mandating fiduciary duty to administer the New Lands, including through the issuance of leases and rights-of-way.

**E.      Any claims for trespass damages and penalties from supposed trespass by the United States are dismissed**

Plaintiffs allege that ONHIR committed grazing trespass on the Padres Mesa Demonstration Ranch, in violation of ONHIR's grazing regulations.  Compl. ¶¶ 50- 51, 55, 57, 128, 129 (citing 25 C.F.R. §§ 700.709–.710, 700.725).  The Court does not believe Plaintiffs were asking the Court to award trespass damages and penalties for the government's failure to issue itself a grazing permit.  Rather, the Court believes Plaintiffs were asking for trespass damages and penalties as a form of liquidated damages for the breach of the government's fiduciary duty regarding grazing.  *See* Pls.' Resp. at 31–34.  However, to the extent that Plaintiffs were asking for trespass damages and penalties for the government's failure to issue itself a grazing permit, the Court dismisses those claims, as neither the Settlement Act, nor the grazing regulations, allow for trespass damages against the United States.

The regulations state that "[a]ll payments for such [livestock trespass] penalties and damages shall be paid to [ONHIR's] Commissioner for use as a range improvement fund."  25 C.F.R. § 700.725(e).  However, "[t]hese regulations are only applicable to Indian Lands in that they are part of a regulatory framework which impose a duty on the United States to protect the Tribes' [grazing] estate.  Any failure of the United States to prevent [grazing] trespass, if proven

at trial, would be compensable as damages for breach of trust under *Mitchell II.*" *Shoshone Indian Tribe of Wind River Rsrv., Wyoming v. United States*, 52 Fed. Cl. 614, 628 (2002) (holding that the United States could not be subject to the trespass penalties provided for in 43 C.F.R. § 9230, stating that "[t]respassers will be liable for damages to the United States, and will be subject to prosecution for such unlawful acts"). Put simply, to the extent that Plaintiffs are requesting trespass damages and penalties for the government's failure to issue itself a grazing permit, those claims are dismissed because the grazing regulations do not require the government to collect trespass damages against itself.

**F.      Ruling on Plaintiffs' Request for Equitable Relief is Inappropriate at this Time**

Plaintiffs request various forms of equitable relief. *See* Compl. at 41. The government argues that the Court lacks jurisdiction over these requests for equitable relief because they are not "incident of and collateral to" a money judgment. Motion at 37. However, because this order does not dispose of the Nation's grazing, leasing, rights-of-way, and revenue claims, the Court reserves ruling on the government's motion to dismiss Plaintiffs' request for equitable relief regarding those claims for lack of jurisdiction until such time as the merits of those claims are before it.

**CONCLUSION**

For the foregoing reasons, the Court hereby **GRANTS** the government's motion to dismiss the beneficiaries' claims, any claims asserted by the Nation accruing prior to the 2014 tribal trust settlement agreement, and any claims requesting trespass damages and penalties in and of themselves. The Court hereby **DENIES** the government's motion to dismiss the Nation's leasing and rights-of-way claims. Finally, the Court **RESERVES** ruling on the government's motion to dismiss the Nation's request for equitable relief.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge