# In the United States Court of Federal Claims

No. 21-1746
(Filed: February 13, 2025)

```
* * * * * * * * * * * * * * * * * *
                                  *
NAVAJO NATION, et al.,            *
                                  *
                Plaintiffs,       *
                                  *
        v.                        *
                                  *
THE UNITED STATES,                *
                                  *
                Defendant.        *
                                  *
* * * * * * * * * * * * * * * * * *
```

*Daniel I.S.J. Rey-Bear*, with whom was *Timothy H. McLaughlin*, Rey-Bear McLaughlin LLP, of Spokane, WA, for Plaintiff.

*Sara E. Costello*, Trial Attorney, Environment & Natural Resources Division, Natural Resources Section, Department of Justice, of Washington, D.C., for Defendant.

## OPINION AND ORDER

**SOMERS**, Judge.

Plaintiffs, the Navajo Nation and multiple Navajo families ("relocatees"), filed a motion to reconsider, a motion to enter partial final judgment, and a motion to certify for interlocutory appeal certain rulings by the Court in *Navajo Nation v. United States*, 171 Fed. Cl. 246 (2024). Specifically, Plaintiffs challenge the Court's dismissal of the relocatees' claims for lack of standing, lack of subject matter jurisdiction, and Plaintiffs' regulatory trespass penalties and damages claim.[1]  In response, the government opposed Plaintiffs' motion to reconsider these holdings, Plaintiffs' motion to enter partial final judgment regarding the regulatory trespass penalties and damages claim, and Plaintiffs' motion for interlocutory appeal for all issues.  The government did not oppose Plaintiffs' motion for partial final judgment regarding the relocatees' standing to bring suit.  For the reasons explained below, the Court denies all of Plaintiffs' motions.

---

[1] The Court could characterize its ruling on standing as jurisdictional; however, although Article III's standing requirements "are jurisdictional in a broad sense, they are more accurately characterized as prerequisites to subject matter jurisdiction." *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 252–53 (2024) (collecting cases).

# BACKGROUND

The facts of this case are largely set forth in the Court's opinion on the government's motion to dismiss. *See Navajo Nation*, 171 Fed. Cl. at 252–57. Rather than rehashing the extensive factual record, the Court will recount only the salient facts here. In August 2021, Plaintiffs "filed a complaint against the United States for damages sustained from alleged federal maladministration of grazing, leasing, rights-of-way, revenue deposits, investments, and expenditures regarding tribal land that the United States holds in trust for the Navajo Nation." *Id.* at 251. The government "moved to dismiss the [relocatees'] claims, the claims brought by the Nation that accrued prior to a 2014 settlement between the government and the Nation, the leasing and rights-of-way claims, the claims for trespass damages, and [Plaintiffs'] request for equitable relief." *Id.* On April 30, 2024, the Court granted the government's motion to dismiss the relocatees' claims, any of the Nation's claims that accrued prior to the 2014 settlement, and any claims for regulatory trespass penalties. *Id.* at 272. The Court denied the government's motion to dismiss the Nation's leasing and rights-of-way claims and reserved ruling on the government's motion to dismiss the Nation's request for equitable relief. *Id.*

Following the Court's ruling, on July 3, 2024, Plaintiffs filed a motion for reconsideration pursuant to Rule 54(b) of the Rules of the U.S. Court of Federal Claims ("RCFC"), an RCFC 54(b) motion for entry of partial final judgment, and a motion to certify for interlocutory appeal under 28 U.S.C. § 1292(d)(2). ECF No. 38. Plaintiffs move the Court to reconsider its dismissal of the relocatees' claims for lack of standing and the Court's dismissal of Plaintiffs' regulatory trespass penalty claims. *Id.* at 1. Alternatively, Plaintiffs move the Court to enter partial final judgment on the relocatees' standing dismissal and dismissal of Plaintiffs' regulatory trespass penalties claims. *Id.* Absent entry of final judgment, Plaintiffs move the Court to certify these same issues for interlocutory appeal. *Id.*

In response, the government opposes Plaintiffs' request for reconsideration because, according to the government, Plaintiffs fail to "identify any intervening change in controlling law[,] newly discovered evidence," or manifest injustice. ECF No. 41 at 4; *see also id.* at 1–2. The government states that it does not oppose Plaintiffs' request for entry of partial final judgment for the relocatees' standing dismissal but that it does oppose such entry of judgment for the trespass damages ruling because "Plaintiffs do not appear to have identified the required separate claim for partial final judgment . . . ." *Id.* Additionally, the government opposes Plaintiffs' motion for interlocutory appeal because, as the government argues, "[t]here is no 'substantial ground for difference of opinion' regarding the Court's ruling." *Id.* at 4–5 (quoting 28 U.S.C. § 1292(b)).

**DISCUSSION**

**A.    Legal Standard**

**1.    Motion for Reconsideration**

Plaintiffs argue that their motion for reconsideration should be analyzed under RCFC 54(b), whereas the government seems to contend that the standard under RCFC 59(a) applies. ECF No. 38 at 6–7; *see* ECF No. 41 at 2–3.  In relevant part, RCFC 54(b) provides that,

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

The modern consensus among judges of this Court is that RCFC 54(b) applies to interlocutory decisions whereas RCFC 59(a) applies to final judgments.  *E&I Glob. Energy Servs., Inc. v. United States*, 152 Fed. Cl. 524, 530 (2021) ("RCFC 54(b) applies to reconsideration of interlocutory decisions, while the more rigorous RCFC 59(a) & (e) apply to reconsideration of matters for which Judgment has been entered.  This formula is supported by the language of the Rules, which is admittedly confusing, and by the analogous civil rules and the approach of our sister district courts.").  An interlocutory decision is one that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" and does not "trigger a judgment."  *See id.* at 531 (quoting RCFC 54(b)).  In the present case, the Court dismissed the relocatees' claims for lack of standing.  *Navajo Nation*, 171 Fed. Cl. at 257–60.  Notably, the Court did not dismiss most of the claims brought by the Nation.  *Id.* at 263–64.  Therefore, because the Court adjudicated "fewer than all the claims or the rights and liabilities of fewer than all the parties" by only dismissing the relocatees' claims and not all the Nation's claims, the RCFC 54(b) standard governs analysis of Plaintiffs' motion for reconsideration.  RCFC 54(b).

Reconsideration under RCFC 54(b) is available "as justice requires."  *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 48 (2011) (quoting *Potts v. Howard Univ. Hosp.*, 623 F. Supp. 2d 68, 71 (D.D.C. 2009)).  The "as justice requires" standard affords the Court significant discretion in determining whether reconsideration is appropriate.  *Loveridge v. United States*, 150 Fed. Cl. 123, 126 (2020) ("While the threshold for reconsideration under RCFC 54(b) is imprecise, 'it certainly leaves within [its] ambit . . . a good deal of space for the Court's discretion.'" (alteration in original) (quoting *Martin v. United States*, 101 Fed. Cl. 664, 671 (2011) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004))); *E&I Glob. Energy Servs., Inc.*, 152 Fed. Cl. at 533 ("RCFC 54(b) afford[s] judges of the Court of Federal Claims with great[] discretion to deny motions for reconsideration that offer no good reasons to alter interlocutory decisions.").  Although RCFC 54(b) affords great discretion, the Court must nonetheless exercise its discretion based on the principle that "[r]econsideration of a judgment is not intended to permit a party to retry the allegations included in [the] plaintiff's complaint when it previously was afforded a full and fair opportunity to do so."  *Hymas v. United States*, 141 Fed. Cl. 735, 738 (2019).  Put differently, this flexibility is not "an invitation for litigants to treat

interlocutory decisions 'as mere first drafts, subject to revision and reconsideration at a litigant's pleasure,'" *E&I Glob. Energy Servs., Inc.*, 152 Fed. Cl. at 533 (quoting *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988)), or as an "opportunity for a party to take a second bite at the apple by rearguing positions that have been rejected," *Johnson v. United States*, 126 Fed. Cl. 558, 560 (2016) (quoting *Shell Petroleum, Inc. v. United States*, 47 Fed. Cl. 812, 819 (2000)).

### 2. Motion for Entry of Partial Final Judgment

In addition to providing an opportunity for "reconsideration" of an interlocutory decision, RCFC 54(b) also provides that,

> [w]hen an action presents more than one claim for relief—whether as a claim, counterclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

It is a "well settled principle" that, under RCFC 54(b), the 'determination' of whether a matter should be subject of an immediate appeal, is left to the sound discretion of the trial court . . . ." *Favell v. United States*, 22 Cl. Ct. 132, 142 (1990). While Rule 54(b) of the Federal Rules of Civil Procedure (the FRCP analog to RCFC 54(b)) was adopted to "relax[] the restrictions upon what should be treated as a judicial unit for the purposes of appellate jurisdiction," the rule "preserves the historic federal policy against piecemeal appeals." *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 432, 438 (1956). Indeed, the Federal Circuit has emphasized that piecemeal appeals are "inappropriate in cases that should be given unitary review." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 699 (Fed. Cir. 2001). In other words, judgments under RCFC 54(b) must be reserved "for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by the pressing needs of the litigants for an early and separate judgment as to some claims or parties." *Cherokee Nation of Okla v. United States*, 23 Cl. Ct. 735, 738 (1991) (quoting *Morrison-Knudsen Co., Inc., v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981)).

In deciding a motion for entry of partial final judgment, the Court "must make both a determination of finality and a determination that there exists no just reason for delay." *Abbey v. United States*, 101 Fed. Cl. 239, 241 (2011) (citing *Samish Indian Nation v. United States*, 85 Fed. Cl. 525, 528–29 (2009)). Regarding finality, the Court "must first determine that it is dealing with a 'final judgment.'" *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7 (1980). A final judgment is a judgment on a "cognizable claim for relief," which is final in that it ultimately disposes of an "individual claim entered in the course of a multiple claims action." *Id.*; *id.* (quoting *Sears*, 351 U.S. at 436). Put differently, for a decision to be final, there must be an individual or separable claim or party[2] and the Court must have made a ruling on that claim or regarding that party that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs.,*

---

[2] "Rule 54(b) may be applied not only when 'an action presents more than one claim for relief' but also 'when multiple parties are involved.'" *Abbey*, 101 Fed. Cl. at 242 (quoting RCFC 54(b)).

*Inc.*, 975 F.2d 858, 863 (Fed. Cir. 1992) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)).

Even if the Court finds that a claim is final, it must still determine whether, in its discretion, it can certify that there is no just reason for delay. *Favell*, 22 Cl. Ct. at 142. In determining whether there is no just reason for delay, the Court "must take into account judicial administrative interests as well as the equities involved" and may consider "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Curtiss-Wright*, 446 U.S. at 8. Judicial administrative interests may include whether the appellate court may subsequently face similar questions on appeal of remaining claims in the same action. *See Abbey*, 101 Fed. Cl. at 243. Regarding separability, the more closely connected a party's claims for entry of partial judgment are to remaining claims, the "less appropriate it is for the court to certify those claims for immediate appeal." *Id.* at 244 (citing *Cold Metal Process v. United Eng'g Foundry Co.*, 351 U.S. 445, 452 (1956)).

### 3. Motion for Interlocutory Appeal

Motions for interlocutory appeal are governed by statute:

> When any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

28 U.S.C. § 1292(d)(2). The standard articulated in section 1292(d)(2) for the Court of Federal Claims is "virtually identical" to the certification standard that applies to the district courts under 28 U.S.C. § 1292(b). *Petro-Hunt, LLC v. United States*, 91 Fed. Cl. 447, 451 (2010) (quoting *Am. Mgmt. Sys., Inc. v. United States*, 57 Fed. Cl. 275, 276 (2003)). The decision whether to certify an interlocutory appeal is "committed to the sound discretion of the trial judge." *Id.* "It is well-accepted that interlocutory appeals" under section 1292(d)(2) "are reserved for 'exceptional' or 'rare' cases and should be authorized only with great care." *Klamath Irrigation Dist. v. United States*, 69 Fed. Cl. 160, 161 (2005).

Section 1292(d)(2) sets out a three-part test for certification: "(i) there must be a 'controlling question of law . . . involved;' (ii) there must be a 'substantial ground for difference of opinion' regarding that question; and (iii) 'immediate appeal . . . may materially advance the ultimate termination of the litigation[.]'" *Petro-Hunt*, 91 Fed. Cl. at 451 (alterations in original) (quoting *Aleut Tribe v. United States*, 702 F.2d 1015, 1019 (Fed. Cir. 1983)). A "controlling question of law" is one that "materially affect[s] issues remaining to be decided in the trial court." *Pikes Peak Fam. Hous., LLC v. United States*, 40 Fed. Cl. 673, 686 (1998) (emphasis omitted) (quoting *Brown v. United States*, 3 Cl. Ct. 409, 411 (1983)). "Substantial ground for

difference of opinion" can manifest in instances in which there are "two different, but plausible, interpretations of a line of cases." *Klamath Irrigation Dist*, 69 Fed. Cl. at 163. More often, though, such substantial grounds are evidenced by a circuit split on the issue, *Marriot Int'l Resorts, LP v. United States*, 63 Fed. Cl. 144, 146 (2004), an intra-circuit conflict, or conflict between earlier circuit precedent and a later Supreme Court case, *Ins. Co. of the West v. United States*, No. 99-124C, 1999 WL 33604131 at *4 (Fed. Cl. Dec. 10, 1999), or, at the very least, a "substantial difference of opinion" among judges of this Court, *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409, 419–20 (2003), *rev'd on other grounds*, *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005). Lastly, whether certification would "materially advance the ultimate termination of the litigation" depends in large part on considerations of "'judicial economy' and the need to avoid 'unnecessary delay and expense' and 'piecemeal litigation.'" *Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 11, 14 (2001) (quoting *Northrop Corp. v. United States*, 27 Fed. Cl. 795, 800–01 (1993)).

## B. Analysis

Without extensively repeating the Court's original opinion in this case, a trust relationship, for Indian Tucker Act purposes, requires a showing of two facts. First, the party seeking to invoke Indian Tucker Act jurisdiction "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Inter-Tribal Council of Ariz. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020) (quoting *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009)). Second, after identifying such a statute, the party must demonstrate that the statute "can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) (alterations in original) (quoting *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206, 219 (1983)).

In addition to establishing the requisite trust relationship, to invoke Indian Tucker Act jurisdiction, the party must be a "tribe, band, or other identifiable group of American Indians. . . ." 28 U.S.C. § 1505. Although the Federal Circuit has not decided what constitutes an "identifiable group" under the Indian Tucker Act, other judges of this Court have concluded that "if a claimant group is unable to bring suit in this Court as a tribe, they can still bring suit under the Indian Tucker Act as an 'identifiable group' if they were once part of—or are lineal descendants of someone who was once part of—an organized tribe that no longer exists or represents the interests of the claimant group." *Navajo Nation*, 171 Fed. Cl. at 261 (citing *Chippewa Cree Tribe of the Rocky Boy's Rsrv. v. United States* ("*Chippewa Cree*"), 69 Fed. Cl. 639, 673 (2009)). The Court also noted that, if, instead, the party seeking to invoke the Indian Tucker Act does not "'lack formal organization as a tribe' but [is a] 'member[] of [a] plaintiff-tribe that is a party to [the] litigation' that represents the [party's] 'interests as its constituents,' the [party is] 'simply not an identifiable group pursuant to 28 U.S.C. § 1505, but [is], rather, [a] member[] of a tribe.'" *Id.* (quoting *Osage Tribe of Okla. v. United States* ("*Osage II*"), 85 Fed. Cl. 162, 168 (2008)).

Plaintiffs make three motions in response to the Court's holdings. First, Plaintiffs move the Court under RCFC 54(b) to reconsider its holdings. In the alternative, Plaintiffs move the Court under RCFC 54(b) to enter certain rulings as partial final judgments. Lastly, absent entry

of an RCFC 54(b) final judgment, Plaintiffs move the Court under 28 U.S.C. § 1292(d)(2) to certify certain rulings for interlocutory appeal. The Court addresses each of Plaintiffs' motions in the order presented.

### 1. The Court Denies Plaintiffs' Motion for Reconsideration Because Justice Does Not Require Reconsideration of the Court's Previous Rulings in This Case.

Plaintiffs move this Court to reconsider three of its holdings. First, Plaintiffs contend that justice requires the Court to reconsider whether the relocatees have a sufficient trust relationship with the government to confer standing. ECF No. 38 at 8–13. Second, Plaintiffs assert that the Court must reconsider its decision that the relocatees are not an "identifiable group of American Indians" for Indian Tucker Act purposes. *Id.* at 14 (quoting 28 U.S.C. § 1505); *see also id.* at 14–22. Lastly under this motion, Plaintiffs argue that the Court incorrectly concluded that Plaintiffs are not entitled to regulatory trespass penalties from alleged grazing trespasses by the United States. *Id.* at 22–26. The Court declines to reconsider all three holdings.

Reconsideration under RCFC 54(b) is available "as justice requires." *L-3 Commc'ns Integrated Sys., L.P.*, 98 Fed. Cl. at 48 (quoting *Potts*, 623 F. Supp. 2d at 71). As the Court observed above, although a trial court has much discretion in ruling on an RCFC 54(b) reconsideration motion, this discretion is neither "an invitation for litigants to treat interlocutory decisions 'as mere first drafts,'" *E&I Glob. Energy Servs., Inc.*, 152 Fed. Cl. at 533 (quoting *Quaker Alloy Casting Co.*, 123 F.R.D. at 288), nor an "opportunity to take a second bite at the apple by rearguing positions that have been rejected." *Johnson*, 126 Fed. Cl. at 560 (quoting *Shell Petroleum, Inc.*, 47 Fed. Cl. at 819). Yet, this is exactly what Plaintiffs' motion for reconsideration does.

### a. The Court's "identifiable group" and trust relationship holdings

To successfully bring a breach of trust claim, a plaintiff invoking the Indian Tucker Act "must show the existence of a trust relationship with the government" to have standing and, for the Court to have jurisdiction, *inter alia*, be a member of a "tribe, band, or other identifiable group of American Indians." *Navajo Nation*, 171 Fed. Cl. at 261 (quoting *Fletcher v. United States*, 26 F.4th 1314, 1322 (Fed. Cir. 2022)); *id.* at 260 (quoting 28 U.S.C. § 1505). In its opinion, the Court concluded that the relocatees were neither able to show the existence of a trust relationship with the government nor "demonstrate that [they] are an 'identifiable group of American Indians.'" *Id.* at 258, 262 (quoting 28 U.S.C.§ 1505). Plaintiffs fail to apprise the Court of why justice requires reconsideration of either holding.

At the outset, the Court acknowledges the government's observation that Plaintiffs raise nothing new. *See* ECF No. 41 at 12–15. Because a motion for reconsideration is not an "opportunity for a party to take a second bite at the apple by rearguing positions that have already been rejected," the Court will largely avoid readdressing arguments it has already rejected. *Johnson*, 126 Fed. Cl. at 560 (quoting *Shell Petroleum, Inc.*, 47 Fed. Cl. at 819).

First, it is clear that the relocatees are not entitled to reconsideration of the Court's standing ruling because they cannot show the existence of a trust relationship with the United

States.  Plaintiffs argue that the Court must reconsider whether the relocatees have standing for claims asserted separately from the Nation's.  ECF No. 38 at 13.  In what seems to be a pattern, Plaintiffs rehash arguments already considered and rejected by the Court.  For instance, Plaintiffs repeat arguments regarding common law trust principles, continually relying on the same assertion that the relocatees are beneficiaries of a trust.  *See* ECF No. 12 at 7–8; ECF No. 38 at 9.  Similarly, Plaintiffs repeat arguments asserting that the language in 25 U.S.C. § 640d-10(h)[3] "mandates" that a trust relationship exists, ECF No. 12 at 19; ECF No. 38 at 10, assertions that organizational standing requirements can be somehow be read to show that, because the Nation has standing, the relocatee-members of the Nation must also individually have standing themselves, ECF No. 12 at 10; ECF No. 38 at 21, and allegations that the Office of Navajo and Hopi Indian Relocation ("ONHIR") conceded the relocatee's standing to bring individual claims for relief separate from the Nation.  ECF No. 12 at 3; ECF No. 38 at 3.  None of these repeated arguments persuade the Court that justice requires reconsideration of the relocatees' standing.

To the extent that Plaintiffs assert new arguments or authorities, Plaintiffs still fail to show that justice requires reconsideration.  Plaintiffs rely heavily on language in section 640d-10 that provides that lands "shall be administered by the Commissioner until relocation under the Commission's plan is complete and such lands shall be used solely for the benefit of Navajo families residing on Hopi-partitioned lands."  25 U.S.C. § 640d-10(h) (footnote omitted); *see also* ECF No. 12 at 12; ECF No. 38 at 2.  According to Plaintiffs, this language creates a fiduciary relationship between the individual relocatees and the federal government as the statutory language expressly provides that lands are to be administered "solely for the benefit of Navajo families."  *See* ECF No. 38 at 1 (quoting 25 U.S.C. § 640d-10(h)).  However, this statutory language, by itself, is insufficient to establish the requisite trust relationship.  A "statute or regulation that recites a general trust relationship" between the government and an Indian plaintiff "is not enough to establish any particular trust duty."  *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (citing *United States v. Mitchell* ("*Mitchell I*"), 445 U.S. 535, 542–44 (1980)).  Instead, there must be a specific statute, regulation, or other source of law that "establish[s] a fiduciary relationship and define[s] the contours of the [government's] fiduciary responsibilities."  *Mitchell II*, 463 U.S. at 224.

The language on which Plaintiffs rely is akin to the *Mitchell* plaintiffs' reliance on the language of the General Allotment Act of 1887 in *Mitchell I*.  There, the plaintiffs argued, and the Court of Claims erroneously concluded that, the Act's language providing that the United States was to "hold the land . . . in trust for the sole use and benefit of the [allotees]" was sufficient to establish a fiduciary relationship between the Indian allotees and the federal government.  *Mitchell I*, 445 U.S. at 541–42 (alteration in original).  The Supreme Court reversed, holding that

---

[3] As the Court noted in its original opinion, the Settlement Act and its amendments were previously codified at 25 U.S.C. §§ 640d–640d31.  *Navajo Nation*, 171 Fed. Cl. at 252 n.1.  In 2016, the Office of the Law Revision Counsel omitted the Act and its amendments from Title 25 because they were "of special and not general application."  *See* ECF No. 7 at 4 n.1; ECF No. 1 at 1 n.1 (citing Office of Law Revision Counsel, U.S. House of Reps., Ed. Reclassif.: Title 25, U.S.C., available at https://uscode.house.gov/editorialreclassification/t25/index.html (last visited Feb. 6, 2025)).  The full text of the Act can still be found in 25 U.S.C. § 640d as codified in 2012.  *See* ECF No. 7 at 4 n.1.  As such, all references to the Settlement Act are to the version codified in 2012.

the Act did not "unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands" and, therefore, no such fiduciary relationship existed. *Id.* at 542. Instead, that language created only a "limited trust relationship" between the United States and Indian allottees and did not "impose any duty upon the Government to manage [the resources at issue]." *Id.* As the Court previously explained in its opinion on the government's motion to dismiss, *see Navajo Nation*, 171 Fed. Cl. at 258–260, the statutory language upon which Plaintiffs rely does not create a sufficient fiduciary relationship between the relocatees and the United States to confer standing on the relocatees to recover damages for alleged breaches.

If any question exists as to whether the language in section 640d-10(h) creates a trust relationship between the relocatees and the United States, that question has been answered by a more recent congressional decree. Congress clarified the vague language of section 640d-10 with its enactment of 25 U.S.C. § 640d-30. Under section 640d-30(b), all net income "derived by the Navajo Tribe from the surface and mineral estates of lands located in New Mexico that are acquired for the benefit of the *Navajo Tribe* under section 640d-10" is to be "deposited into the Navajo Rehabilitation Trust Fund." *Id.* (emphasis added). Furthermore, the statute provides that funds in the Navajo Rehabilitation Trust Fund "shall be available *to the Navajo Tribe*" and be used "solely for purposes which will contribute to the continuing rehabilitation and improvement of the economic, educational, and social condition of families, and Navajo *communities*" affected by three statutorily prescribed events.[4] *Id.* § 640d-30(d) (emphasis added). The statutory language explicitly names the "Navajo Tribe" as the beneficiary of the Navajo Rehabilitation Trust Fund and allocates spending to improve the economic, educational, and social conditions of the "communities" within the Tribe. *Id.* This statutory language cannot be read to suggest that the individual relocatees themselves have a trust relationship with the United States; instead, it clearly indicates that the Nation is the beneficiary and has the requisite trust relationship with the federal government. Therefore, if the Court were to award damages directly to the relocatees, who are not beneficiaries of the Trust Fund, the Court would violate the specific instructions Congress prescribed in section 640d-30. The Court declines to do so.

To support their position that the relocatees are beneficiaries of the trust, Plaintiffs rely on three cases: *Fletcher*, 26 F.4th 1314, *Osage Nation v. United States* ("*Osage I*") 57 Fed. Cl. 392 (2003), and *Osage II*, 85 Fed. Cl. 162 (2008). ECF No. 38 at 10–11, 17. None of these cases supports their assertions, as all three cases involve statutes that, in relevant part, have language expressly mandating payments to individual Indians. At issue in *Fletcher* was the right of individual "headright" owners to receive royalties generated from mineral deposits on lands held in trust by the government. *See Fletcher*, 26 F.4th at 1318. The relevant language in the statute at issue in *Fletcher* provides

---

[4] The three statutorily prescribed events are "(1) the decision in the Healing case, or related proceedings, (2) the provision of this subchapter, or (3) the establishment by the Secretary of the Interior of grazing district number 6 as land for the exclusive use of the Hopi Tribe." *Id.* § 640d-30(d)(1)–(3). The Court discussed at length in its opinion on the government's motion to dismiss the "Healing case," *Healing v. Jones*, 210 F. Supp. 125 (D. Ariz. 1962), *aff'd*, 373 U.S. 758 (1963) (per curiam), and subsequent legislative enactments regarding the settlement area. *Navajo Nation*, 171 Fed. Cl. at 252–55.

> [t]hat all the funds of the Osage tribe of Indians, and all the moneys now due or that may hereafter be found to be due to the said Osage tribe of Indians, and all moneys that may be received from the sale of their lands in Kansas under existing laws, and all moneys found to be due to said Osage tribe of Indians on claims against the United States, after all proper expenses are paid, shall be segregated as soon after January first, nineteen hundred and seven, as is practicable and placed to the credit of the *individual members* of the said Osage tribe on a basis of a pro rata division among the *members* of said tribe . . . .

Act for the Division of the Lands and Funds of the Osage Indians in Oklahoma Territory and for Other Purposes, Pub. L. No. 59-321, 34 Stat. 539, 544 (1906) ("1906 Act") (emphasis added). In *Fletcher*, the Federal Circuit concluded that the individual headright owners had standing because they were beneficiaries of the mineral estate held in trust by the United States. 26 F.4th at 1322. In coming to this conclusion, the *Fletcher* court emphasized that the language of the 1906 Act "explicitly provide[d] that the royalties from the mineral estate are to be placed in the trust account 'to the credit of the members' and 'distributed to the individual members'" on a "basis of pro rata division among the members of said tribe." *Id.* (quoting the 1906 Act, 34 Stat. at 544). In other words, the statute in *Fletcher* contained language explicitly affording funds directly to individual members of the Osage tribe. *See id.*

Here, neither section 640d-10 nor section 640d-30 contains any such language. Instead, section 640d-10 creates a bare trust under *Mitchell I* and section 640d-30 references only the "Navajo Tribe" as the beneficiary and "Navajo communities" as where any money from the Navajo Rehabilitation Trust Fund must be spent. *See* 25 U.S.C. § 640d-30(b), (d). Therefore, because section 640d-30 is devoid of any reference to individual members of the Navajo tribe, and instead explicitly references the "Navajo Tribe" as the beneficiary of the Trust Fund, *Fletcher* can be easily distinguished and does not support Plaintiffs' claims.

Plaintiffs also rely on *Osage I* and *Osage II*. ECF No. 38 at 17. In *Osage I*, the Osage Nation sought damages from the government for breach of fiduciary duty in the mismanagement of tribal trust funds. 57 Fed. Cl. at 393. The statute at issue in *Osage I* provides, in relevant part, that

> the royalty received from oil, gas, coal, and other mineral leases . . . shall be placed in the Treasury of the United States *to the credit of the members* of the Osage tribe of Indians as other moneys of said tribe are to be deposited under the provisions of this Act, and the same *shall be distributed to the individual members* of said Osage tribe according to the roll provided for herein, in the manner and at the same time that payments are made of interest on other moneys held in trust for the Osages by the United States . . . .

*Id.* (alterations in original) (quoting the 1906 Act at 544 (emphasis added)). In that case, the government moved to dismiss the Osage Nation's claims, to the extent that the Nation sought damages "on behalf of individual headright interests not held by the [Nation]." *Id.* at 394. The government argued that the Nation lacked standing to bring claims on behalf of the aggrieved individual headright owners because the Nation could not establish that it "personally suffered

some actual or threatened injury as a [f]ederally-recognized Tribe." *Id.* (citation omitted). The *Osage I* court found that the Nation suffered a "sufficient injury . . . to establish standing" because the mismanaged mineral royalties at issue there "go first into a tribal trust fund account" operated by the Nation, which was "then responsible for the ultimate distribution to the individual headright owners." *Id.* at 395. The *Osage I* court accordingly denied the government's motion to dismiss. *Id.* at 398.

Five years later, *Osage II* concerned whether eight individuals who self-identified as "personal owners of allotted shares or 'headrights'" could intervene in the action already brought by the Osage Nation in *Osage I*. 85 Fed. Cl. at 162. The Osage Nation opposed the intervention, arguing that the intervening group did not constitute an "identifiable group" for Indian Tucker Act purposes because the individuals in that group were already members of the Osage Nation and were thus already represented by the Nation in that litigation. *Id.* at 166–67. The proposed intervenors, much like Plaintiffs here, relied on two cases, *Chippewa Cree*, 69 Fed. Cl. 639, and *Wolfchild v. United States* ("*Wolfchild I*"), 62 Fed. Cl. 521 (2004), "to support their contention that they qualified as an 'identifiable group'" under the Indian Tucker Act. *Id.* at 167. The *Osage II* court distinguished both cases, stating that "unlike in *Chippewa Cree* and *Wolfchild*, the organization of which Proposed Intervenors are members, the Osage Nation, is a party to this litigation." *Id.* at 168. Ultimately, the *Osage II* court concluded that the proposed intervenors were not an "identifiable group," but rather were members of a tribe whose interests were already sufficiently represented by the Osage Nation, which was already a party to the action. *Id.* Therefore, the motion to intervene was denied.

Plaintiffs' reliance on *Osage I* and *Osage II* fails for three reasons. First, the statutory language at issue in *Osage I* and *Osage II*, much like the statute in *Fletcher*, explicitly authorized payments to individual headright holders. *See Osage I*, 57 Fed. Cl. at 393 ("[U]nder the provisions of this Act, [royalty payments] shall be distributed to the *individual members* of said Osage tribe." (emphasis added) (quoting the 1906 Act at 544)); *Fletcher*, 26 F.4th at 1322 ("[W]e observe that the statute specifies that funds are placed 'to the credit of the *members*' 'on a basis of a pro rata division among the *members* of said tribe . . . .'" (emphasis added) (quoting *Fletcher v. United States*, 730 F.3d 1206, 1209–10 (10th Cir. 2013))). As explained above, section 640d-30 only contains language authorizing payments to the "Navajo Tribe" without ever mentioning payments to individual relocatees. *See* 25 U.S.C. § 640d-30(b), (d). Therefore, *Osage I* and *Osage II* are readily distinguishable from Plaintiffs' contentions that the relocatees have standing as beneficiaries.

Second, even if the relocatees were beneficiaries of the Trust Fund, the *Osage I* court's conclusions actually cut *against* Plaintiffs. As explained above, the *Osage I* court found standing for the Osage Nation, despite the statutory language stating that the individual headright owners were the beneficiaries of the trust, because any royalties would first be deposited in the Nation's trust fund before distribution to the headright owners. *Osage I*, 57 Fed. Cl. at 395. In a sense, the Osage Nation served as an intermediary between the government and the individual headright owners, as the Nation would manage and distribute government-awarded royalties to the headright owners. Later, in *Osage II*, the court denied the individual headright owners' intervention in the case because they were members of the Osage Tribe and were, therefore, already represented by the Nation, which was a party to the litigation. *Osage II*, 85 Fed. Cl. at

11

168.  Here, even if the relocatees were beneficiaries of the Trust Fund, the Navajo Nation would be an analogous intermediary, as section 640d-30(d) states that "[f]unds in the Navajo Rehabilitation Trust Fund . . . shall be available to the Navajo Tribe." 25 U.S.C. § 640d-30(d). In other words, the Navajo Nation manages the Trust Fund on behalf of all beneficiaries of the fund.[5] Accordingly, just as the Osage Nation already represented the beneficiary headright owners in *Osage II*, the Navajo Nation would already represent the relocatees here (assuming for the sake of argument that they are beneficiaries) because the Navajo Nation manages the Trust Fund and is already a party to this litigation. This precludes the relocatees' participation in this case as an entity separate from the Nation that already represents them.

Third, although Plaintiffs argue that the procedural posture of *Osage II* is "nothing like [their] case" because here "the Nation and [relocatees] have jointly sued to assert their undisputed discrete interests," rather than the relocatees later moving to intervene in the Nation's previously-filed action, ECF No. 38 at 17–18, the relocatees still lack standing to bring any claims. Regardless of the timing of the relocatees' participation in this suit, whether at the outset as an original filer or later as an intervenor, the relocatees do not have a sufficient trust relationship with the federal government to confer standing. *Navajo Nation*, 171 Fed. Cl. at 258, 262.

In addition, Plaintiffs assert that the Court must revisit its holding that the relocatees are not an "identifiable group" for Indian Tucker Act purposes.[6] ECF No. 38 at 14. However, in doing so, Plaintiffs largely recycle arguments already considered and rejected. For example,

---

[5] "The [Navajo Rehabilitation] Trust Fund is essentially a loan from the federal government to the Navajo Nation to be repaid from revenues derived from leases of the lands and minerals taken into trust in New Mexico pursuant to the Settlement Act as amended. The tribe assumed responsibility for managing the Trust Fund pursuant to the American Indian Trust Fund Management Reform Act of 1994, according to Interior officials. Under this act, neither Interior, ONHIR, nor Treasury has a role in managing or overseeing the Trust Fund once a tribe has assumed responsibility for managing it." U.S. GOV'T ACCOUNTABILITY OFF., GAO-18-266, OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION: EXECUTIVE BRANCH AND LEGISLATIVE ACTION NEEDED FOR CLOSURE AND TRANSFER OF ACTIVITIES 9 (2018) ("2018 GAO Report").

[6] To the extent Plaintiffs bring this action under the Tucker Act, *see* ECF No. 1 at ¶ 2, Plaintiffs still fail to establish the Court's jurisdiction over the relocatees' claims because the relocatees have not established a trust relationship with the government:

> Although the plaintiff's complaint only asserts jurisdiction under the Tucker Act, . . . *Navajo II* still provides the relevant jurisdictional test for an individual Indian's breach-of-trust claim. The Federal Circuit has described the *Navajo II* test as the two-part test used "[i]n the context of breach of duties to American Indians," even when individual Indians bring breach-of-trust claims under the Tucker Act. *Fletcher v. United States*, 26 F.4th 1314, 1324–25 (Fed. Cir. 2022) (applying the *Navajo II* test to find Tucker Act jurisdiction over a group of individual Indians' breach-of-trust claim while declining to address whether the group of plaintiffs qualified as an "identifiable group of Indians" for jurisdiction under the Indian Tucker Act); *see also Samish Indian Nation v. United States*, 419 F.3d 1355, 1364, 1367 (Fed. Cir. 2005) (noting that a "fiduciary duty can also give rise to a claim for damages within the Tucker Act or Indian Tucker Act").

*Gilham v. United States*, 164 Fed. Cl. 1, 9 (2023) (second alteration in original).

Plaintiffs reiterate that the Nation does not represent the relocatees, who they claim have distinct legal interests separate from those of the Nation, ECF No. 12 at 12; ECF No. 38 at 4, that certain relocatee claims are not precluded by the Nation's 2014 settlement because the relocatees "were not parties" to that agreement, ECF No. 12 at 14; ECF No. 38 at 4, and that the Court's "requiring" the Nation to represent the relocatees is an affront to the Nation's sovereignty. *See* ECF No. 12 at 12; ECF No. 38 at 20–21. What Plaintiffs do not mention is what distinct legal interests, separate from the Nation's, the relocatees have or why the Nation is not capable of representing the relocatees.[7] As the Court explained, "if a claimant group is unable to bring suit in this Court as a tribe, they can still bring suit under the Indian Tucker Act as an 'identifiable group' if they were once part of—or are lineal descendants of someone who was once part of—an organized tribe that no longer exists or represents the interests of the claimant group." *Navajo Nation*, 171 Fed. Cl. at 261. Because the relocatees are members of the Navajo Nation, which is a party to this very litigation, the relocatees are not an "identifiable group" but rather are "members of a tribe." *Id.* at 261–62 (quoting *Osage II*, 85 Fed. Cl. at 168). Absent any showing that the Nation cannot represent the interests of the relocatees—and Plaintiffs here fail to make any such showing—the relocatees are adequately represented by the Nation and their separate claims must be dismissed without reconsideration.

Plaintiffs have failed to show why justice requires reconsideration of the Court's standing or "identifiable group" holdings. The language in section 640d-10, at best, creates a bare trust relationship, and the language of section 640d-30 is clear in stating that the Nation, not the relocatees, is the beneficiary of the Trust Fund. For this reason, only the Nation, and not the relocatees, has standing to sue the government for maladministration because it has a sufficient trust relationship with the United States. The Court also does not have jurisdiction over the relocatees' claims under the Indian Tucker Act because they are not "an identifiable group of American Indians" for Indian Tucker Act purposes. Instead, they are members of the very tribe that is named as a plaintiff in this action, and their interests are thus adequately represented in this litigation. The Court declines to reconsider its dismissal of the relocatees' claims for lack of standing or lack of subject matter jurisdiction.

### b. The Court's trespass penalties and damages holding

Plaintiffs contend that the Court must reconsider its denial of regulatory trespass penalties and damages from alleged grazing trespasses by the United States. ECF No. 38 at 22. Plaintiffs' approach in arguing this point is the same as it was in arguing for reconsideration of the Court's standing and jurisdictional rulings. Plaintiffs make the same argument asserted in previous briefing that ONHIR is liable for trespass because it is a federal agency and not a Navajo entity entitled to make use of the lands set aside by the Settlement Act. ECF No. 12 at 31–32; ECF No.

---

[7] In fact, it appears the Navajo Nation has already shown its ability to adequately represent the relocatees in its relations with the government: "the Navajo Rehabilitation Trust Fund is essentially a loan from the federal government to the Navajo Nation to be paid back from revenues derived from leases of the lands and minerals taken into trust in New Mexico pursuant to the Settlement Act as amended . . . [w]hile the Navajo Nation acknowledges its legal obligation to repay the Treasury, the tribe is seeking loan forgiveness because the Trust Fund's purpose was to aid the relocatees and the tribe views such aid as an unfulfilled federal obligation, according to tribal officials." 2018 GAO Report at 52–53.

38 at 5.  Therefore, as with their arguments above, Plaintiffs once again fail to show why justice requires reconsideration their trespass penalties claim.

However, the Court will briefly clarify its holding regarding trespass damages.  As the Court explained in its opinion, under 25 C.F.R. § 700.725(e), "[a]ll payments for [livestock trespass] penalties and damages shall be paid to the [ONHIR] Commissioner for use as a range improvement fund."  *Navajo Nation*, 171 Fed. Cl. at 272 (alterations in original) (quoting 25 C.F.R. § 700.725(e)).  Payments for trespass penalties and damages under 25 C.F.R. § 700.725(e) are to be paid to the government because the United States holds lands in trust for the Nation.  It would be counterintuitive to hold that the United States must collect trespass penalties, and pay such penalties to itself, for "trespassing" on these lands.  Instead, "[t]hese regulations are only applicable to Indian Lands in that they are part of a regulatory framework which impose a duty on the United States to protect the Tribes' mineral estate."  *Id.* (alterations in original) (quoting *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States* ("*Shoshone*"), 52 Fed. Cl. 614, 628 (2002)).  Accordingly, while Plaintiffs cannot directly seek these regulatory trespass penalties from the United States, "[a]ny failure of the United States to prevent . . . trespass, if proven at trial, would be compensable as damages for breach of trust under *Mitchell II*."  *Shoshone*, 52 Fed. Cl. at 628.

When questioned on this theory at oral argument, Plaintiffs' counsel *conceded* that the Court was correctly interpreting their trespass claim.[8]  To recap, the government moved to dismiss in its entirety Plaintiffs' trespass damages claim.  It appeared to the Court, however, that Plaintiffs were not making the trespass damages claim that the government sought to dismiss.  In other words, the government was seeking to dismiss a strawman.  To ensure that the Court was correctly assessing what was happening, the Court asked Plaintiffs' counsel at oral argument if the government was correct that Plaintiffs were making the claim that the government sought to dismiss or if the Court was correct that Plaintiffs were not making such a claim.  Plaintiffs'

---

[8] During oral argument, the Court sought clarification regarding the nature of this claim in the following exchange with Plaintiffs' counsel in the middle of the Court's questioning the government on its motion to dismiss the trespass claim:

> THE COURT: Well, I don't think the United States trespassed.  I mean, that's a tort claim.  [Plaintiffs are] not bringing a tort claim.  What [Plaintiffs are] saying is the United States had an obligation to administer the lands, and in doing that, they had to do it for the benefit, at the very least of the nation, if not for a subgroup of beneficiaries, so when the United States allowed grazing without paying for it, that was a maladministration of the new lands. . . .

> I don't think [Plaintiffs are] complaining about the United States not issuing itself a permit.  What they're complaining about is the United States used the land without providing compensation.  I mean, I'm just going to interrupt, isn't that generally the plaintiff's claim or am I mischaracterizing the plaintiff's claim?

> MR. REY-BEAR: You have precisely stated the plaintiff's claim.

ECF No. 18 at 70:1–9; 70:25–71:9.

counsel unequivocally answered that the Court was correct.  ECF No. 18 at 71:5–9 ("You have precisely stated the plaintiff's claim."); *Midas Res., Inc. v. United States*, 168 Fed. Cl. 385, 403 (2023) ("Indeed, in [the plaintiff's] response to the government's motion to dismiss, [the plaintiff] expressly abandons a regulatory takings claim or such a theory of recovery.  These waivers bind [the plaintiff]." (citations omitted)); *see also Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) ("A party ordinarily is bound by his representations to a court, and—having staked out his position in response to the district court's inquiry—the appellant cannot now repudiate that position." (citation omitted)).  This left the Court with a choice.  Deny the government's motion because it was seeking to dismiss a claim Plaintiffs represented that they did not bring.  Or, alternatively, clarify that no such claim exists and grant the government's motion to any extent Plaintiffs were bringing the claim they repudiated at oral argument.  The Court chose the latter approach.  But, to be clear, this dismissal was over an empty set of claims according to Plaintiffs' counsel's own representation at oral argument.  Plaintiffs cannot now seek reconsideration of a claim they conceded never existed in the first place.

But as the Court explained in its opinion, the Nation can assert a breach of trust claim for any resources lost due to the government's alleged trespass.  For example, damages could arise from the government's failure as a fiduciary to protect land from damage by trespassing, the government's failure to obtain range value and permit fees for grazing trespass by third parties, the government providing under-market services, maladministration of lands and resources, and liquidated damages for breach of fiduciary duty.  The Court did not dismiss any of these potential claims asserted by the Nation.  Instead, the Court solely dismissed—to the extent Plaintiffs were seeking such damages, which Plaintiffs' counsel represented at oral argument they were not— any direct claim for regulatory trespass penalties from the United States.  The Court further notes that if the government can prove that the alleged trespass actually *benefitted* the Nation, any claims asserted by the Nation for breach of fiduciary duty would then fail because the government would not be in breach of its fiduciary duties.

In sum, any claims for damages arising from the government's alleged violation of 25 C.F.R. § 700.725 are dismissed and will not be reconsidered because such claims were conceded at oral argument and are not permitted by the regulation cited in support of them.  For these reasons, the Court denies Plaintiffs' motion to reconsider its trespass penalties and damages holding.

### 2.  The Court Denies Plaintiffs' Motion for Entry of Partial Final Judgment Because There Is Just Reason for Delay.

Next, Plaintiffs move this Court to enter partial final judgment pursuant to RCFC 54(b) on the same three holdings for which they seek reconsideration—the relocatees' lack of a trust relationship with the government, the fact that the relocatees are not an "identifiable group" for Indian Tucker Act purposes, and denial of regulatory trespass penalties and damages.  ECF No. 38 at 26–30.  As discussed below, the Court declines to enter final judgment for any of these holdings.

Under RCFC 54(b), "[w]hen an action presents more than one claim for relief . . . or when multiple parties are involved," the Court may, in its discretion, "direct entry of a final

15

judgment as to one or more, but fewer than all, claims or parties." Such judgment may only be entered if the Court makes determinations "that it is dealing with a 'final judgment'" and "that there are no just reasons to delay the appeal of individual final judgments." *Curtiss-Wright*, 446 U.S. at 7, 8. Plaintiffs argue that dismissal of the relocatees' claims for lack of standing and subject matter jurisdiction "plainly constitutes a final judgment." ECF No. 38 at 28. Plaintiffs are correct. A judgment is final for the purposes of RCFC 54(b) when it "terminates the litigation between the parties . . . and leaves nothing to be done but to enforce by execution what has been determined." *Parr v. United States*, 351 U.S. 513, 518 (1956) (quoting *St. Louis, Iron Mountain & S. Ry. Co. v. S. Express Co.*, 108 U.S. 24, 28 (1883)). Dismissal due to lack of standing and subject matter jurisdiction of one set of plaintiffs' claims in an action brought by multiple plaintiffs suffices as a final judgment under this standard.

However, even though the standing and jurisdictional holdings in the Court's opinion on the government's motion to dismiss would qualify as final judgments, there exists just reason for delay in entering final judgment on both holdings. Plaintiffs first argue that there is "no risk of appeals [sic] having to decide issues twice or conflicting later determinations since standing and identifiable-group status only concern the [relocatees]." ECF No. 38 at 28. A similar situation arose in *Sierra Club v. Colo. Springs Utils.*, No. 5-cv-1994, 2008 WL 4197789 (D. Colo. Sept 10, 2008). There, the district court dismissed for lack of standing a group of plaintiffs referred to as the "Thibeaut Plaintiffs" and left the other plaintiff Sierra Club's claims untouched. *Id*. at *1. The Thibeaut Plaintiffs subsequently moved for entry of partial final judgment regarding their dismissal for lack of standing. *Id*. The district court observed that, "[a]lthough the standing issues on which the Thibeaut Plaintiffs were dismissed are separate and distinct from the claims presented by Plaintiff Sierra Club . . . the interests of the parties are significantly linked due to the nature of the claims against Defendants." *Id*. at *2. Finding that considerations on appeal would "likely be similar or interrelated," the district court found a just reason for delay to avoid piecemeal litigation. *Id*. Here, although the relocatees' dismissal for lack of standing and subject matter jurisdiction is separate and distinct from the Nation's claims, the interests of the relocatees and the Nation are similarly significantly linked due to the nature of those claims. Not only are they significantly linked, but also, they are identical claims as both the relocatees and the Nation assert identical, duplicative maladministration and trespass claims. *See* ECF No. 38 at 28. Therefore, there is just reason for delay here, as there was in *Sierra Club*, in upholding the federal policy against piecemeal appeals. *See Sears*, 351 U.S. at 438.

Plaintiffs also argue that, without entry of an RCFC 54(b) judgment, there would be "tremendous hardship for all and particular injustice for the [relocatees]" because the government "only recently filed its Answer, discovery has yet to begin, and the numerous remaining claims almost certainly will require prolonged litigation." ECF No. 38 at 28. To the extent Plaintiffs argue entry of judgment would expedite discovery, it would actually have the exact opposite effect by delaying the Nation's claims from adjudication. Due to the identical nature of the relocatees' and Nation's claims, any entry of judgment on the relocatees' claims and subsequent appeal of that judgment would necessitate a stay of the Nation's pending claims until the Federal Circuit resolves the relocatees' appeal. This course of action would entail both piecemeal and prolonged litigation before this Court contrary to sound judicial administration. Another judge of this Court grappled with a similar situation in *Petro-Hunt*. In that case, the plaintiffs sought entry of an RCFC 54(b) judgment for certain claims. *Id*. at 449–50. The Court,

recognizing the existence of overlapping facts between the claims the plaintiffs sought to appeal and the remaining claims, stated that it would be "hard-pressed to continue with any aspect of this case while the appeal under RCFC 54(b) was pending." *Id.* at 451. Therefore, because the case had already been stayed for many years, the *Petro-Hunt* court deemed it in the interests of sound judicial administration to proceed with the case and deny the RCFC 54(b) motion. *Id.* Here, Plaintiffs' case has been before the Court for over three years. While this duration does not compare to the eight-year delay in *Petro-Hunt*, the Court finds that sound judicial administration requires denial of Plaintiffs' RCFC 54(b) motion. Like in *Petro-Hunt*, the relocatees' and Nation's claims have significant factual overlap—in fact, here, they are identical claims. Thus, any immediate appeal of the relocatees' claims would necessitate staying the Nation's pending claims until the Federal Circuit's resolution of the relocatees' appeal.

In other words, the Court has two choices to advance this case. First, the Court could grant the relocatees' RCFC 54(b) motion and stay the Nation's claims pending resolution of the relocatees' appeal. This approach is highly inefficient, as the Nation, the party with standing before this Court, must halt the prosecution of its case and wait for the Federal Circuit to decide issues that neither affect the Nation nor have any bearing on the relocatees' ultimate recovery. Staying the Nation's case prolongs recovery for all Plaintiffs, as any recovery would be awarded to the Nation and disbursed by the Nation from the Trust Fund. The Court declines to delay adjudication of the Nation's claims any further.

Alternatively, the Court could allow the Nation's case to proceed and deny the relocatees' RCFC 54(b) motion. This approach is congruous with sound judicial administration. Because the relocatees' and Nation's claims are so similar, it would be more efficient to deny the relocatees' motion and to allow the Nation to proceed with discovery as the Nation would likely uncover facts beneficial to both it and the relocatees in the near future, rather than awaiting a decision from the Federal Circuit solely on the relocatees' standing and the Court's jurisdiction to hear their claims. For example, both the relocatees and the Nation are represented by the same counsel, who will likely be asking the same questions in depositions, streamlining the discovery process for both parties. Therefore, it would be more efficient to begin discovery right away rather than delaying the case for the relocatees, whose recovery entirely depends on a judgment in favor of the Nation anyway.

In addition, just as there is nothing to reconsider regarding Plaintiffs' grazing trespass claims, there is nothing to enter RCFC 54(b) judgment on. As mentioned above, to the extent Plaintiffs are *now* attempting to argue in the motions presently before the Court that ONHIR is liable for trespass penalties under 25 C.F.R. § 700.725 for its own alleged trespass on the New Lands,[9] the Court will not consider such an argument as Plaintiffs, at oral argument, disclaimed

---

[9] Plaintiffs state:

First, even though there [sic] "overlap in the backstory[,]" the grazing self-dealing claim is "analytically distinct" and therefore legally separate from the remaining grazing claims. That claim specifically and discretely concerns ONHIR's own trespass. In contrast, the remaining grazing claims concern other New Lands grazing maladministration, including allowing illegal third-party livestock trespass, not allowing [the relocatees] to graze

that they were seeking such damages. Put differently, the Court cannot enter an RCFC 54(b) judgment on a claim Plaintiffs said they were not making.

In sum, although the Court's standing and subject matter jurisdiction holdings are "final" judgments for RCFC 54(b) purposes, the Court cannot grant Plaintiffs' RCFC 54(b) motion because there is just reason for delay.

### 3. The Court Denies Plaintiffs' Motion for Interlocutory Appeal Because Plaintiffs Failed to Satisfy the Requirements for Certification Under 28 U.S.C. § 1292(d)(2).

Finally, in addition to seeking entry of judgment under RCFC 54(b), Plaintiffs move the Court to certify for interlocutory appeal the same three holdings discussed above. ECF No. 38 at 31–35. Because Plaintiffs fail to satisfy the requirements for certification under 28 U.S.C. § 1292(d)(2), the Court denies Plaintiffs' motion for interlocutory appeal for all three holdings.

First, the Court must note that seeking certification under 28 U.S.C. § 1292(d)(2) is not an appropriate alternative to seeking judgment under RCFC 54(b). As the Third Circuit has observed, "[i]f an order can be made appealable by a Rule 54(b) certificate, it, and not a § 1292(b) certificate, should be sought."[10] *Ford Motor Credit Co. v. S.E. Barnhart & Sons, Inc.*, 664 F.2d 377, 379–81 (3d Cir. 1981) (quoting 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 110.22(5) (2d ed. 1980)). Here, the three holdings for which Plaintiffs seek interlocutory appeal could—if there was no just reason for delay—be made appealable under RCFC 54(b). Thus, section 1292(d)(2) certification is not the appropriate certification. Although "[s]ection 1292(d)(2) is similar to Rule 54(b), . . . each is designed to address different situations." *Bush v. Adams*, 629 F. Supp. 2d 468, 474 (E.D. Pa. 2009); *see also Ford Motor Credit Co.*, 664 F.2d at 380 ("Rule 54(b) and 28 U.S.C. § 1292(b) should be carefully distinguished in application because they serve different interests."). Whereas section 1292(d)(2) "applies only to orders that would be considered interlocutory even if presented in a simple, single-claim, two-party case," RCFC 54(b) "applies only to adjudications that would be final under Section 1291 if they occurred in an action having the same limited dimensions." *See Ultra-Precision Mfg. Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1359 (Fed. Cir. 2003) (quoting 10 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2658.2 (3d ed. 1998)).

Nonetheless, to the extent that section 1292(d)(2) could apply here, Plaintiffs fail to prove that they satisfy the criteria for an interlocutory appeal. Even if the Court were to assume that the issues Plaintiffs seek interlocutory appeal on present controlling questions of law, Plaintiffs have not shown that there exists either a substantial ground for difference of opinion or that

---

livestock when warranted, and ONHIR's other failures to comply with its own grazing regulations to fulfill its federal trust responsibility for long-term sustained yield and use of the New Lands for the [relocatees].

ECF No. 38 at 29–30; *see* ECF No. 42 at 18 (second alteration in original) (citations omitted).

[10] 28 U.S.C. § 1292(b) is the district court analog of 28 U.S.C. § 1292(d)(2), which applies to the Court of Federal Claims.

interlocutory appeal would materially advance the ultimate termination of this litigation. First, generally, a substantial ground for difference of opinion could exist if there is a circuit split, an intra-circuit disagreement, or a substantial disagreement between judges of this Court on the issue to be certified. *Petro-Hunt*, 91 Fed. Cl. at 452–53. In the context of a circuit split, courts "will find a substantial ground for difference of opinion if . . . 'the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point . . . .'" *Coates v. Brazoria Cty. Tex.*, 919 F. Supp. 2d 863, 868–69 (S.D. Tex. 2013) (quoting 4 Am. Jur. 2d *Appellate Review* § 124 (2012)). However, "if a controlling court of appeals has decided the issue, no substantial ground for difference of opinion exists and there is no reason for an immediate appeal." *Brown v. Mesirow Stein Real Est., Inc.*, 7 F. Supp. 2d 1004, 1008 (E.D. Ill. 1998) (quoting *Kirkland & Ellis v. CMI Corp.*, No. 95-C-7457, 1996 WL 674072, at *4 (N.D. Ill. Nov. 19, 1996)); *Ryan, Beck & Co. v. Fakih*, 275 F. Supp. 2d 393, 398 (E.D.N.Y. 2003) ("Disagreement among courts outside [this] Circuit does not establish a substantial ground for difference of opinion" (quoting *Colon ex rel. Molina v. BIC USA, Inc.*, No. 00-CV-3666, 2001 WL 88230, at * 2 (S.D.N.Y. Feb. 1, 2001))).

Rather than alleging an intra-circuit schism in the Federal Circuit or a disagreement between judges of this Court on the issue whether a trust relationship is required for standing, Plaintiffs seem to suggest the existence of a circuit split on this issue following the D.C. Circuit's decision in *Tanner-Brown v. Haaland*, 105 F.4th 437 (D.C. Cir. 2024). *See* ECF No. 38 at 7, 10–11. The *Tanner-Brown* court held that "whether a trust relationship exists between a plaintiff and the federal government is best characterized as a substantive merits decision that should not be reached unless and until there is Article III standing." 105 F.4th at 446. Accordingly, Plaintiffs argue that "the Court must accept the [relocatees'] legal theory that Section 11 establishes a trust relationship for them with attendant fiduciary duties" for standing purposes because the existence of a trust relationship is a merits question only to be addressed after confirmation of Article III standing. *See* ECF No. 38 at 10–11 (citing *Tanner-Brown*, 105 F.4th at 437).

Plaintiffs' argument cannot prevail. It is well settled in the Federal Circuit, to have standing to bring a breach of trust claim between Indians and the United States, a plaintiff must prove the existence of a trust relationship between the Indian entity and the government. *Fletcher*, 26 F.4th at 1322 ("For the plaintiffs to have standing . . . [i]n the context of breach of trust claims, the plaintiffs must show the existence of a trust relationship with the government. We find that, under the 1906 Act, such a trust relationship exists and plaintiffs have standing."); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 477 (2003) ("[T]he more fundamental objection to the Government's position is that, if carried to its conclusion, it would read the trust relation out of Indian Tucker Act analysis . . . ."). In other words, in the Federal Circuit, for breach of trust analyses, the existence of a trust relationship is a standing question, not a merits question. *Fletcher*, 26 F.4th at 1322. Therefore, as the Federal Circuit has spoken directly on this, Plaintiffs fail to demonstrate that the standing issue in this case satisfies the substantial ground for difference of opinion prong of the section 1292(d)(2) analysis. *See CMI Corp.*, 1996 WL 674072, at *4 ("If a controlling court of appeals has decided the issue, no substantial ground for difference of opinion exists and there is no reason for an immediate appeal.").

The closest Plaintiffs get to identifying a potential source of a substantial ground for difference of opinion is highlighting the fact that the Federal Circuit has never squarely addressed "what constitutes an 'identifiable group of Indians' under the Indian Tucker Act." ECF No. 38 at 17; *Fletcher*, 26 F.4th at 1324 ("During oral argument, plaintiffs' counsel stated that there was no need to reach the question of Indian Tucker Act jurisdiction if the court found Tucker Act jurisdiction . . . . Because we do . . . find [Tucker Act jurisdiction], we do not address Indian Tucker Act jurisdiction and who constitutes an 'identifiable group of Indians.'"). Although courts may find substantial ground for difference of opinion "if the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point," *Coates*, 919 F. Supp. 2d at 868–69, Plaintiffs fail to identify any differing opinions on what constitutes an identifiable group in any other circuit. Additionally, as the Court extensively covered in its original opinion in this case, there is no substantial disagreement among judges of this Court regarding the definition of an "identifiable group" for Indian Tucker Act purposes. *Navajo Nation*, 171 Fed. Cl. at 261 (collecting cases).

Instead, Plaintiffs argue the Court's decision contravenes two cases. The first case is *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272 (1955). Plaintiffs argue that in *Tee-Hit-Ton*, the Supreme Court found standing for an "'identifiable group of American Indians of between 60 and 70 individuals residing in Alaska' who were 'a clan of the [existing, federally recognized] Tlingit Tribe, [and] brought suit'" under the Indian Tucker Act. ECF No. 38 at 15 (alterations in original) (quoting *Tee-Hit-Ton*, 348 U.S. at 273). However, in *Tee-Hit-Ton*, the Supreme Court explained that the Tee-Hit-Tons were an Indian *tribe* that was part of the larger Tlingit Tribe: "the Tlingits [are] a group composed of numerous interconnected tribes including the Tee-Hit-Tons." 348 U.S. at 285. Moreover, as the government correctly points out in its response, *Tee-Hit-Ton* concerned whether the plaintiffs there had a sufficient ownership interest in certain lands to qualify as an "identifiable group." ECF No. 41 at 11. The government also correctly distinguishes *Tee-Hit-Ton* from the facts here, as the relocatees "do not have a similar ownership interest" in the trust corpus as the *Tee-Hit-Ton* plaintiffs had in the land in question there and, in *Tee-Hit-Ton*, the identifiable group of Indians was not "suing as a separate group along with a Tribe that was party to the litigation and could represent their interests." *Id.* The second case on which Plaintiffs rely, *Wolfchild v. United States* ("*Wolfchild II*"), 101 Fed Cl. 54 (2011), is similarly not on point. As the government correctly notes, both the *Wolfchild I* and *Osage II* courts acknowledge that the *Wolfchild II* plaintiffs sued as a group of identifiable Indians because their tribe was no longer in existence. ECF No. 41 at 12 (citing *Wolfchild I*, 62 Fed. Cl. at 540; *Osage II*, 85 Fed. Cl. at 167). *Wolfchild II* is materially distinguishable from the facts here, as both the Navajo Nation and the relocatees jointly sued. Because *Tee-Hit-Ton* and *Wolfchild II* are easily distinguishable from the facts of this case, neither case evidences a differing opinion on what constitutes an identifiable group in contrast with the Court's ruling.

Therefore, Plaintiffs have failed to show any substantial ground for difference in opinion regarding the Court's holdings. The Federal Circuit has squarely ruled that the existence of a trust relationship is a question of standing and that, without such a relationship, plaintiffs do not have standing to sue for breach of trust claims under the Tucker Act or Indian Tucker Act. *Fletcher*, 26 F.4th at 1322. Relatedly, although the Federal Circuit has not conclusively ruled on what is an "identifiable group" for Indian Tucker Act purposes, Plaintiffs fail to identify any disagreement on the issue either among the circuits or the judges of this Court with the extensive

case law cited by this Court in deciding this issue in its original opinion. For these reasons, no substantial ground for difference of opinion exists, and there is no reason for an immediate appeal of the Court's trust relationship and identifiable group holdings.

Even if there were substantial ground for difference of opinion, certification of these issues for interlocutory appeal would not materially advance the ultimate termination of this litigation. This prong turns on considerations of judicial economy and the need to avoid unnecessary delay, expense, and piecemeal litigation. *Coast Fed. Bank, FSB*, 49 Fed. Cl. at 14. Plaintiffs argue that certification for interlocutory appeal would conserve judicial resources because "'the parties will be able to consolidate their discovery efforts for the overlapping aspects of' [the relocatees'] and the Nation's remaining post 2014-settlement claims." ECF No. 38 at 34 (quoting *Fairholme Funds Inc. v. United States*, 147 Fed. Cl. 126, 131 (2019)). However, just as the Court would have to stay the Nation's case if it granted Plaintiffs' RCFC 54(b) motion, the Court would have no choice but to stay the Nation's case if it granted Plaintiffs' motion for interlocutory appeal. As explained above, stalling the Nation's case to adjudicate the rights of a party without standing is highly inefficient, especially considering the identical nature of the Nation's and relocatees' claims. If anything, proceeding with the case and forgoing interlocutory appeal would be more beneficial to the relocatees because their claims are so similar to those of the Nation that resolution of the Nation's claims would be beneficial to the relocatees in the event that this Court's standing determination were eventually overturned on appeal. Additionally, as mentioned above, because the amount of damages that could be awarded as a result of the alleged maladministration would be the same whether brought by the relocatees or the Nation itself, continuing with the case would bring a speedier resolution to Plaintiffs' claims. For these reasons, judicial economy dictates that the Court deny the relocatees' motion for interlocutory appeal to both conserve judicial resources and effect a quicker resolution of the Nation's claims to potentially benefit all parties involved.

Finally, Plaintiffs move the Court to certify for interlocutory appeal their grazing self-dealing claim. However, as explained above, this request is moot because Plaintiffs conceded this argument at oral argument. ECF No. 18 at 71:5–9. Therefore, there is nothing to certify for interlocutory appeal on this issue.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Plaintiffs' motions for reconsideration, entry of judgment under RCFC 54(b), and for certification for interlocutory appeal. The parties **SHALL** file their joint preliminary status report within **30 days** of the issuance of this opinion.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge